UNITED STATES, Appellee

v.

John D. AYALA, Private First Class
U.S. Army, Appellant.

No. 94–0369.
CMR No. 9102598.

U.S. Court of Appeals for
the Armed Forces.

Argued March 29, 1995.[1]

Decided Sept. 29, 1995.

1. This case was argued at the United States Military Academy, at the invitation of its Department of Law, and without objection from the parties involved. The hearing was conducted as part of "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court but also the quality and effectiveness of the criminal justice system of our Armed Forces, under the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). See 34 MJ at 195 n. 1. By special permission from the Court, Cadet First Class Brian C. Baldrate argued and Cadet First Class Michael E. Bindas participated in the brief as amicus curiae urging reversal, under the supervision of Colonel William E. Harlan and Captain Michael J. Benjamin for the Department of Law, United States Military Academy. Cadet First Class Kelly C. Brown argued as amicus curiae urging affirmance, under the supervision of Major Jon L. Lightner for the Department of Law, United States Military Academy.

*Fran W. Walterhouse, Captain Teresa L. Norris* (on brief); *Lieutenant Colonel James H. Weise.*

For Appellee: *Captain J. Key Schoen* (argued); *Colonel John M. Smith, Captain Eugene E. Baime, Captain Anthony P. Nicastro* (on brief); *Captain Gregory T. Baldwin.*

*Opinion of the Court*

GIERKE, Judge:

1. A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of stealing military explosives and illegally importing explosive materials into the United States without a license (18 USC § 842), in violation of Articles 121 and 134, Uniform Code of Military Justice, 10 USC §§ 921 and 934, respectively. The approved sentence provided for a dishonorable discharge, confinement for 2 years, total forfeitures, and reduction to the lowest enlisted grade.

2. The Court of Military Review[2] dismissed the charge of importing explosive materials but affirmed the conviction of larceny and the sentence, after reducing the confinement to 18 months. 37 MJ 632, 636 (1993). That court then reconsidered, permitted appellant to file additional assignments of error, and reaffirmed its earlier decision. 38 MJ 633, 635 (1993).

3. We granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED WHEN HE FAILED TO SUPPRESS THE EVIDENCE FOUND DURING THE ILLEGAL CUSTOMS INSPECTION OF THE PACKAGE MAILED BY APPELLANT BECAUSE THE PACKAGE WAS OPENED IN VIOLATION OF THE REQUIREMENT THAT THERE BE "REASONABLE CAUSE TO SUSPECT" THE PACKAGE CONTAINED MERCHANDISE WHICH WAS IMPORTED CONTRARY TO LAW.

For Appellant: *Major Roy H. Hewitt* (argued); *Colonel Stephen D. Smith, Major*

2. *See* 41 MJ 213, 229 n. * (1994).

## II

WHETHER APPELLANT'S SENTENCE MUST BE SET ASIDE TO NEGATE THE EFFECTS OF UNLAWFUL COMMAND INFLUENCE ON APPELLANT'S POST-TRIAL CLEMENCY PROCEEDINGS.

We resolve both issues against appellant.

### Issue I: Illegal Customs Inspection

4. While in Saudi Arabia during Operation Desert Shield/Desert Storm, appellant stole 3.74 pounds of C–4, a military explosive, from an Army truck. He mailed it to his mother in Colorado. United States Customs agents inspected and seized the package after it arrived at Dulles International Airport.

5. At a pretrial session under Article 39(a), UCMJ, 10 USC § 839(a), appellant moved to suppress the evidence seized by the customs agents. The military judge denied the motion because "the inspection was a valid Customs inspection at a U.S. border." Before the court below and this Court, appellant asserts that the explosives should have been suppressed as evidence because they were the fruit of an illegal search.

6. Appellant "concedes that 'border searches' are not subject to" the Fourth Amendment requirement for a warrant and that the customs inspection after the package arrived at Dulles International Airport was a border search. Final Brief at 5–6. Appellant relies, however, on 19 USC § 482, which authorizes a customs official "to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law." From this he argues that Congress has imposed a statutory requirement that customs agents have "a reasonable cause to suspect" illegal importation before inspecting incoming mail. Final Brief at 6. The Government argues, on the other hand, that 19 USC § 482 only applies to goods "already introduced into the United States" and that the statute applicable to general border searches is 19 USC § 1582, which contains no such "reasonable cause" requirement. Answer to Final Brief at 4–5.

7. We review a military judge's ruling on a motion to suppress—like other decisions to admit or exclude evidence—for an abuse of discretion. *See, e.g., United States v. Johnston,* 41 MJ 13, 16 (CMA 1994) (admissibility of scientific evidence); *United States v. Gray,* 40 MJ 77, 80 (CMA 1994) (admissibility of evidence of a witness' bias); *United States v. Mukes,* 18 MJ 358, 359 (CMA 1984) (admissibility of evidence of uncharged misconduct). *See generally* S. Childress & M. Davis, 2 *Federal Standards of Review* § 11.02 (2d ed.1992) (ruling on admission of evidence reviewed for abuse of discretion). In reviewing a military judge's ruling on a motion to suppress, we review factfinding under the clearly-erroneous standard and conclusions of law under the *de novo* standard. *United States v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2150, 128 L.Ed.2d 876 (1994); *United States v. Mejia,* 953 F.2d 461, 464–65 (9th Cir.1991), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992). Thus, on a mixed question of law and fact as in this case, a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect.

8. The operative facts in this case are not disputed. The dispute is limited to whether the military judge correctly applied the law in denying the motion to suppress, which we will review *de novo.*

9. There is no requirement for "reasonable cause" to conduct a border search. We agree with Judge Howard D. Re's well-reasoned opinion in *United States v. Glasser,* 750 F.2d 1197, 1201–04 (3d Cir.1984), *cert. denied,* 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985), holding that the "reasonable cause" requirement of 19 USC § 482 only applies to customs searches other than border searches. *See also United States v. Taghizadeh,* 41 F.3d 1263, 1265–66 (9th Cir. 1994)(en banc); *United States v. Smith,* 29 F.3d 270, 274 (7th Cir.1994); *United States v. Pringle,* 576 F.2d 1114, 1116 (5th Cir.1978).

10. Furthermore, even when searches of incoming mail are conducted under 19 USC § 482, "reasonable cause" exists if the package to be searched is thicker and heavier than a normal first-class letter. *United States v. Ramsey,* 431 U.S. 606, 614–

15, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *United States v. Smith,* 29 F.3d at 274. Appellant's package containing 3.74 pounds of explosives would clearly meet this standard.

11. For these reasons, we hold that the military judge did not abuse his discretion by denying the defense motion to suppress.

### Unlawful Command Influence

12. After appellant was convicted and sentenced, Specialist (SPC) Martin Slack, a friend of appellant and a member of the same battalion, attempted to gather letters recommending clemency for appellant. In a post-trial affidavit, SPC Slack asserts that, in doing so, he ran into a "continued pattern of resistance." *See* 43 MJ at 305. He attributes his lack of success to unlawful command influence. Final Brief at 12. The Government argues that SPC Slack's affidavit "amounts to no more than a generalized, unsupported claim of command influence," so it is insufficient to shift the burden to the Government to negate it. Final Brief at 6.

13. SPC Slack states that he requested support from Staff Sergeant (SSG) Uzziel, appellant's first-line supervisor; Sergeant First Class (SFC) Penner, appellant's mess chief; Command Sergeant Major (CSM) Lockwood, appellant's battalion sergeant major during Operation Desert Storm; CSM Bates, appellant's battalion sergeant major after Desert Storm; Captain (CPT) Gavlen, appellant's company commander during Desert Storm; CPT Ott, appellant's company commander after Desert Storm; and Lieutenant Colonel (LTC) Van Horn, appellant's battalion commander. All except SFC Penner declined.

14. According to SPC Slack, SSG Uzziel promised a "strong letter." After CSM Bates "instructed him [SSG Uzziel] to review PFC Ayala's counseling file," SSG Uzziel informed SPC Slack that he could not "in good conscience" provide a letter of recommendation.

15. SPC Slack states that SFC Penner supported appellant's request for clemency, and he did so even after being advised by the

company first sergeant that "it was not a wise career move."

16. SPC Slack's affidavit asserts that CSM Lockwood told him that providing a favorable letter "would not be a problem." When SPC Slack returned to obtain the letter, he says that CSM Lockwood said that he was unwilling to write a letter of recommendation unless appellant's current sergeant major (CSM Bates) would also provide a letter.

17. SPC Slack states that CSM Bates was unwilling to provide a letter. According to the affidavit, CSM Bates told SPC Slack that he "was putting [him]self at risk careerwise by pushing things for PFC Ayala."

18. The affidavit further recites that both CPT Gavlen and CPT Ott declined to recommend clemency because "it would be inconsistent with the chain of command." Finally, SPC Slack states that LTC Van Horn refused to see him, but the battalion legal noncommissioned officer informed him that LTC Van Horn did not desire to "speak out against the chain of command."

19. The defense has the initial burden of producing sufficient evidence to raise unlawful command influence. *See Green v. Widdecke,* 19 USCMA 576, 579, 42 CMR 178, 181 (1970) ("[G]eneralized, unsupported claims of 'command control' will not suffice to create a justiciable issue."). As we said in *United States v. Johnston,* 39 MJ 242, 244 (1994), "[T]he threshold triggering further inquiry should be low, but it must be more than a bare allegation or mere speculation." *See United States v. Allen,* 33 MJ 209, 212 (CMA 1991) ("Proof of [command influence] in the air, so to speak, will not do."), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992).

20. The burden of disproving the existence of unlawful command influence or proving that it did not affect the proceeding does not shift to the Government until the defense meets its burden of production. *See United States v. Thomas,* 22 MJ 388, 396 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *United States v. Rosser,* 6 MJ 267 (CMA 1979). *See*

*also* D. Schlueter, *Military Criminal Justice: Practice and Procedure* (hereafter Schlueter) § 6–7 at 269 (3d ed.1992). The issue is not "raised" until the defense meets its burden of production. The quantum of evidence necessary to raise unlawful command influence is the same as that required to submit a factual issue to the trier of fact. *See United States v. Cruz*, 20 MJ 873, 886 (ACMR 1985), *rev'd on other grounds*, 25 MJ 326 (CMA 1987); Schlueter, *supra.* *Cf. United States v. McMonagle*, 38 MJ 53, 58 (CMA 1993), *quoting United States v. Simmelkjaer*, 18 USCMA 406, 410, 40 CMR 118, 122 (1969) (affirmative defense is "reasonably raised" if "record contains some evidence to which the [trier of fact] may attach credit if it so desires").

21. What is missing from SPC Slack's affidavit (¶ 12) is evidence that anyone acting with the "mantle of command authority" unlawfully coerced or influenced any of the officers or noncommissioned officers approached by SPC Slack. *See Art.* 37(a), UCMJ, 10 USC § 837(a); *United States v. Stombaugh*, 40 MJ 208, 211 (CMA 1994). SPC Slack's affidavit does not indicate whether the first sergeant's advice to SFC Penner that support for appellant "was not a wise career move" was intended to coerce SFC Penner or was intended as well-meaning advice against blindly supporting a marginal soldier who had been convicted of serious offenses. It also does not indicate how SFC Penner interpreted the admonition. Assuming, *arguendo*, that the efforts of the unnamed first sergeant to influence SFC Penner constitute unlawful command influence, appellant would not be entitled to relief, because the attempt failed. SFC Penner provided the requested letter. *See United States v. Allen*, 33 MJ at 212–13.

22. SFC Penner's letter also provides some insight into CSM Bates' admonition to SSG Uzziel to "review PFC Ayala's counseling file." SFC Penner wrote, *"While I can not honestly say Pfc Ayala was a trouble free soldier* or an outstanding cook: I can say in all honesty that he was one of the most tactically proficient soldiers in my command." (Emphasis added.) The letter also provides

some insight into SSG Uzziel's statement that he could not "in good conscience" recommend clemency after reviewing appellant's file. *Cf. United States v. Wallace*, 39 MJ 284 (CMA 1994) (no unlawful command influence where superior commander suggested that subordinate reconsider recommendation in light of additional information).

23. SPC Slack's affidavit does not assert that CSM Bates attempted to influence CSM Lockwood. Even if he did, however, any influence exercised by CSM Bates on CSM Lockwood would not constitute unlawful command influence, unless the evidence showed that CSM Bates was acting with the "mantle of command authority." *See United States v. Stombaugh*, 40 MJ at 212 (pressure from peers is not unlawful command influence, but may constitute "interference with access to witnesses"). In short, Slack's affidavit contains no evidence of unlawful influence on CSM Lockwood, "command" or otherwise.

24. The evidence indicates that the remaining officers and noncommissioned officers merely were unwilling to rally to appellant's support after he had been properly convicted and sentenced. CPT Ott, CSM Bates, SFC Penner, and SSG Uzziel all were members of LTC Van Horn's battalion. There is no evidence that they were coerced or intimidated by anyone. CPT Ott was the accuser in the case. He had preferred the charges and forwarded them with a recommendation for a general court-martial. LTC Van Horn, CPT Ott's superior, unsuccessfully tried to support appellant, recommending disposition of the charges by a special court-martial empowered to adjudge a bad-conduct discharge. In his forwarding endorsement, LTC Van Horn said, "[W]e have a case of an immature, but otherwise good soldier making a mistake." The general court-martial convening authority rejected LTC Van Horn's recommendation (and that of the Article 32, UCMJ, 10 USC § 832, investigating officer as well) and referred the case to a general court-martial. Because he had already expressed his support for appellant, LTC Van Horn's refusal to submit additional clemency matters is understandable and suggests nothing sinister.

25. Even if CSM Bates' admonition to SSG Uzziel to read appellant's file before recommending clemency was coercive, there is no evidence that CSM Bates' actions unlawfully deterred SSG Uzziel from recommending clemency. SSG Uzziel's explanation only invokes his own conscience, not fear of CSM Bates or anyone in the chain of command.

26. CSM Bates' alleged admonition to SPC Slack that he was risking his career by supporting appellant is like the first sergeant's admonition to SFC Penner: we cannot tell whether it was intended to coerce or to be helpful. In any event, we need not decide how it was intended or how it was received, because SPC Slack was not deterred from his efforts.

27. CPT Gavlen's unwillingness to take a position "inconsistent with the chain of command" is not further explained, but there is not a scintilla of evidence that his reluctance was due to command coercion or influence.

28. Based on our review of the record, we agree with the court below that SPC Slack's affidavit is insufficient to raise the issue of unlawful command influence.

### Decision

The decision of the United States Army Court of Military Review on further review is affirmed.

Judges COX and CRAWFORD concur.

SULLIVAN, Chief Judge (concurring in part, dissenting in part, and joining WISS' dissent):

29. I agree with the majority opinion on the resolution of Issue I. The search here was a border search and, as such, is subject to a well-recognized exception to the requirements of the Fourth Amendment. *See, e.g., United States v. Smith,* 29 F.3d 270, 274 (7th Cir.1994).

30. I part company, however, with the majority and its resolution of the command-influence issue. On this record and in light

of the unrebutted sworn statement of a service-member that there were numerous events indicating command influence, I cannot say that appellant's approved sentence was free from command influence. I would affirm the decision below as to the findings but not as to the sentence because of defects affecting the action on the sentence. I further would remand this case for a hearing under *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967), on the issue of command influence in the post-trial proceedings.

31. I agree with Judge Wiss' well reasoned analysis of the facts at issue here. I attach the affidavit of Specialist (SPC) Martin W. Slack to further illustrate the factual basis that undercuts the integrity of the sentencing in this case. 43 MJ at 305. I note again (¶ 30) the fact that the affidavit is not only unrebutted but it is from a service-member who would face criminal charges for false swearing if it was untrue, *see* Art. 134, Uniform Code of Military Justice, 10 USC § 934, since it is sworn and submitted in a court proceeding. For this reason, I place great weight on it pursuant to the precedents of our Court. *United States v. Wood,* 25 MJ 46, 48 (CMA 1987); *United States v. Tipton,* 16 MJ 283, 287 (CMA 1983).

I

### CMR CREDIBILITY ASSESSMENT

32. The Court of Military Review held that a post-trial affidavit from "a friend of the appellant" is not sufficiently *credible* evidence to meet his burden of raising an unlawful command-influence issue under Article 37(a), UCMJ, 10 USC § 837(a). *See* 38 MJ 633, 634 (1993). A majority of this Court takes a different tack and holds that this affidavit fails to even state a claim of unlawful command influence. ¶ 28. I disagree with both these conclusions and the majority's elevation of "the mantle of command authority" *dicta*[1] of *United States v. Stom-*

---

1. That decision was expressly based on a harmless-beyond-a-reasonable-doubt standard. We stated:

"Regardless of our characterization of the unlawful influence directed at the two defense witnesses, we agree with the Court of Military

baugh, 40 MJ 208, 211 (CMA 1994), see ¶ 21, to judicial precedent.

33. Turning first to the decision of the Court of Military Review, I conclude that it goes too far as a matter of law. It suggests that a post-trial affidavit by "a friend of the accused" is *per se* unreliable. It relies on the decision of this Court in *Green v. Widdecke*, 19 USCMA 576, 42 CMR 178 (1970), and Judge Cox's concurring opinion in *United States v. Levite*, 25 MJ 334, 340–41 (CMA 1987). *See* 38 MJ at 634. I disagree that credibility of the affiant is an appropriate basis for an appellate court to resolve this post-trial claim. *See generally United States v. Dykes*, 38 MJ 270 (CMA 1993)(opinion of Sullivan, C.J., and Wiss, J.); *see generally United States v. Day*, 969 F.2d 39, 41 (3d Cir.1992); *Dziurgot v. Luther*, 897 F.2d 1222, 1225 (1st Cir.1990)(court must accept truth of allegations in determining whether to order post-trial hearing under 28 USC § 2255).

34. Turning to this Court's prior decision in *Green v. Widdecke, supra*, I note that it does not sanction the Court of Military Review's individual-credibility determination. In that case an accused generally asserted that he was denied due process of law because the commander who convened his court-martial also determined the membership of his court-martial. This Court said:

> While volumes could be written on the subject of command control—the genesis of this contention—for present purposes it is sufficient to observe simply that, absent a showing of any specific basis for the allegation, *the generalized form of contention is inadequate.* Congress was fully aware of the possibilities for abuse arising out of the relationship. Indeed, this aspect of military trials consumed a large portion of its deliberations on the Uniform Code of Military Justice. It continued the provisions relating to appointment of court members and provided safeguards it considered adequate to prevent the abuses of command control. Moreover, this is a

Review and are satisfied beyond a reasonable doubt that any unlawful command influence on either of the two witnesses did not affect the findings or sentence."

matter of deep and continuing concern to the Congress. *See* Congressional Record of July 1, 1970, page S–10438. Our experience during the intervening years has established the basic soundness of this Congressional determination. *See* Annual Report of the United States Court of Military Appeals and the Judge Advocates General of the Armed Forces and the General Counsel of the Department of the Treasury, 1960. *As a review of our decisions will show, generalized, unsupported claims of "command control" will not suffice to create a justiciable issue.*

19 USCMA at 579, 42 CMR at 181 (emphasis added). Review of SPC Slack's affidavit (*see* 43 MJ at 305–10) shows that it does not simply assert unlawful command control.

35. Moreover, Judge Cox's concurring opinion in *United States v. Levite, supra*, offers little support for the Court of Military Review's credibility determination in this case. There, he noted his personal opinion that "[c]ertainly an appellant's unsubstantiated assertion that unlawful command influence exists is not going anywhere." 25 MJ at 341. No legal authority was offered by the Court of Military Review to extend this putative principle to friends of an accused. In any event, a detailed and specific affidavit was offered in this case which averred proof beyond "mere unsupported allegations." *See Aleman v. United States*, 878 F.2d 1009, 1012 (7th Cir.1989); *United States v. Leventopoulos*, 834 F.Supp. 989, 995 (N.D.Ill.1993).

## II

### *MAJORITY THRESHOLD HOLDING*

36. The bottom line of the majority opinion of this Court is that appellant failed to meet his burden to raise an issue of unlawful command influence in violation of Article 37. *See United States v. Hamilton*, 41 MJ 32, 37 (CMA 1994) ("[W]e conclude ... that appellant has not made out his case for command influence."); *United States v. Johnston*, 39 MJ 242, 245 (CMA 1994)("even if we accept

*United States v. Stombaugh,* 40 MJ 208, 214 (CMA 1994).

appellant's base assertions as true, he is not entitled to relief"). I disagree and would order a *DuBay* (¶ 30) hearing in this case to address his post-trial claim of unlawful command influence.

37. The majority of this Court holds that SPC Slack's affidavit does not sufficiently raise the issue of unlawful command influence in the post-trial processing of appellant's case. It states: "What is missing from SPC Slack's affidavit is evidence that anyone acting with the 'mantle of command authority' unlawfully coerced or influenced any of the officers or noncommissioned officers approached by SPC Slack." ¶ 21. This rationale is fatally flawed. Article 37 prohibits unlawful influence of a court-martial or a reviewing authority *by anyone subject to the code.* It states in pertinent part:

> *No person subject to this chapter* may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or *the action of any* convening, approving, or *reviewing authority with respect to his judicial acts.*

(Emphasis added.)

38. Moreover, this Court has applied Article 37 to prohibit the coercion or unlawful influence of reviewing authorities by civilians not subject to the Code. *See United States v. Doherty,* 5 USCMA 287, 17 CMR 287 (1954); *see also United States v. Allen,* 20 USCMA 317, 43 CMR 157 (1971); *United States v. Estrada,* 7 USCMA 635, 23 CMR 99 (1957); *United States v. Fowle,* 7 USCMA 349, 22 CMR 139 (1956). Although these

civilians were in positions of authority in the military civilian hierarchy, they were not literally subject to the Uniform Code of Military Justice. Art. 2, UCMJ, 10 USC § 802. Accordingly, the majority's hypertechnical construction of this important codal provision is unprecedented as well as unwarranted.[2]

39. The majority opinion also concludes that SPC Slack's affidavit is defective because it does not aver that any particular person (command or not) actually influenced appellant's former supervisors or co-workers from providing favorable material to the reviewing authority. ¶ 23. The suggestion here is that appellant is speculating that the absence of recommendations was caused by command influence rather than his own poor performance or the personal choice of his supervisors not to testify. Clearly, such a forbearance, if generated by command action, would violate Article 37. *United States v. Thomas,* 22 MJ 388 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Moreover, such conduct, even if generated by excessive timidity of an individual soldier concerning his career, should not be condoned by this Court. In any event, the proffered affidavit avers that *six* potential witnesses including three officers all shared this belief at the same time in the same command concerning appellant's court-martial review. Moreover, command contact with three enlisted witnesses concerning their career prospects is unrebutted.[3] In my view, these averments as a whole constitute a sufficient circumstantial showing of unlawful command influence to require further investigation. *See United States v. Thomas, supra.*

---

**2.** An additional flaw exists in the "mantle of command" theory of unlawful influence, referenced in *United States v. Stombaugh, supra.* Even if such interference by non-command personnel does not violate Article 37(a), Uniform Code of Military Justice, 10 USC § 837(a), *Stombaugh* suggests that such interference with court-martial witnesses raises constitutional questions under the Fifth and Sixth Amendments. Accordingly, the Supreme Court cases cited in *Stombaugh* (40 MJ at 212) also would require the Government to prove such interference was harmless beyond a reasonable doubt. *See United States v. Weddell,* 800 F.2d 1404 (5th Cir.1986). *See generally Chapman v. California,* 386 U.S. 18,

87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It is well established that a servicemember at a court-martial is protected by the Due Process Clause of the Fifth Amendment. *Weiss v. United States,* —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); *Middendorf v. Henry,* 425 U.S. 25, 43, 96 S.Ct. 1281, 1291, 47 L.Ed.2d 556 (1976).

**3.** It should not be overlooked that the affidavit avers that Sergeant Penner, who actually signed a letter of recommendation despite "not a wise career move" advice from a "HHC 1SG," was "transferred to Korea shortly thereafter." (*See* 43 MJ at 307.)

40. In sum, a bare or unspecific allegation of unlawful command influence is not sufficient to raise that issue post-trial. ¶ 19. Moreover, evidence of the mere failure of officers and enlisted men to submit recommendations to support appellant before the reviewing authority does not raise an issue of unlawful command influence under Article 37. However, evidence that such conduct was motivated by expressed concerns of a large number of service-members for their own careers or loyalty to command is an entirely different matter. *See United States v. Thomas, supra.* Finally, since it appears from the post-trial affidavit in this case that these service-members could have provided relevant and favorable information to the reviewing authority, I would hold that a sufficient showing of unlawful command influence has been made to warrant a *DuBay* (¶ 30) proceeding. In my view, the majority once again makes a grave mistake with regard to this most critical issue of military law. *United States v. Weasler,* 43 MJ 15 (1995).

41. In the instant case, the unrebutted affidavit from a service-member submitted in the judicial process gives me pause to affirm the decision below as to sentence. Too many questions have been raised about the specific actions of too many individuals to say with certainty that justice was free from command influence here. I am from Missouri, and, like President Harry S. Truman, I must be shown.[4]

---

4. President Truman was keenly interested in the military justice system and was proud of his role of signing into law the Uniform Code of Military Justice. I attach two personal letters of the former President to illustrate this. *See* 43 MJ at 311, 312. I believe that the military justice President Truman was talking about in these letters and the present system of justice are different. Justice in the military has come a long way and is a world class system today. But still there are instances (like the present case) where we must see the justice. A system of justice must not just be fair, it must appear to be fair.

APPENDIX A

## IN THE UNITED STATES ARMY COURT OF MILITARY REVIEW

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| Appellee | ) | |
| | ) | AFFIDAVIT |
| v. | ) | |
| | ) | |
| Private First Class JOHN D. | ) | ACMR 9102598 |
| AYALA, 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, | ) | |
| United States Army, | ) | |
| Appellant | ) | |

I, Specialist Martin W. Slack, do swear that the following statements are true and correct to the best of my knowledge:

1.   I was a witness at trial for both the prosecution and the defense.  After the trial, I stayed involved with the case because PFC Ayala is a good friend.

2.   About a week after the trial, I met with PFC Ayala's trial defense counsel, Captain Rogers, to see what I could do to help PFC Ayala.  He told me that he would be submitting a memo to ask for the lightest sentence possible for John and that I could try to gather letters of recommendation [hereinafter LOR] to submit to the convening authority to try to get the sentence reduced.  During the course of the conversation, he told me that he would help me all that he could given his caseload, but once the trial was over and John signed the appellate rights form and left the courtroom, his job was over.  He said that by regulation he didn't have to do anything else on the case.

3.   I saw Captain Rogers a few more times when I was bringing him LORs that I had gotten, but he never really showed an interest in the case or indicated that he was getting out of the Army.  I informed him about the things going on with the chain of command that are discussed below, but he just blew it off like everything

else.

4.    After Captain Rogers left the Army, I asked to see the supervisor in the office and was referred to Major Mark Henderson. He referred me to Captain Eugene Ingrao.  Captain Ingrao truly seemed interested in the case but he didn't know anything about it. He even told me that Captain Rogers had not discussed the case with him, so I had to brief him on everything about the case that was not contained in the record of trial.

5.    Captain Ingrao said that he really couldn't do anything about the chain of command and the events at trial, but that I should just keep track of all these things and let John's appellate attorney know about it.  I was never contacted by John's attorney until this date.

6.    While trying to secure letters of recommendation for the Private First Class John D. Ayala, for consideration of mitigation in his court martial, found a continued pattern of resistance from PFC Ayala's chain of command.  I requested letters of recommendation from Staff Sergeant Uzziel, PFC Ayala's first line supervisor; Sergeant First Class Penner, PFC Ayala's mess chief; Command Sergeant Major Lockwood, PFC Ayala's BN SGM during Desert Shield/Storm; Command Sergeant Major Bates, PFC Ayala's BN SGM after Desert Shield/Storm; CPT Gavlen, PFC Ayala's company commander during Desert Shield/Storm; CPT Ott, PFC Ayala's company commander after Desert Shield/Storm; and LTC VanHorn, PFC Ayala's BN commander.

7.    SSG Uzziel expressed to me in a very strong manner that he felt

that PFC Ayala had been punished too harshly for the crime for which he had been convicted. Furthermore, SSG Uzziel stated that PFC Ayala was an outstanding soldier in peer leadership skills, tactical proficiency and common task skills. SSG Uzziel expressed great interest in aiding PFC Ayala by writing a strong letter of recommendation for him. SSG Uzziel assured me that he would have a strong letter of recommendation for PFC Ayala as soon as possible. Upon returning to secure this letter of recommendation, SSG Uzziel told me that he had spoken with CSM Bates, who instructed him to review PFC Ayala's counselling file. SSG Uzziel stated that after reviewing the file with CSM Bates, he concluded that, in good conscience, he could not write the letter of recommendation. When I suggested that he write the letter in a manner that recognized PFC Ayala's shortcomings as well as his strong points, SSG Uzziel simply refused.

8. SFC Penner had been supportive of PFC Ayala since PFC Ayala's assignment to his mess hall. He instructed me to write as strong a letter of recommendation as I could while still acknowledging his weaknesses. When I returned with the letter of recommendation, SFC Penner stated that he had been advised by the HHC 1SG, whose name I can't recall, against signing such a letter of recommendation because it was not a wise career move. Since he felt so strongly about the case though, he agreed to sign it anyway. SFC Penner was transferred to Korea shortly thereafter.

9. CSM Lockwood was reassigned to 20th ENG. BDE shortly after returning from Desert Storm. Upon tracking him down, I personally

requested a letter of recommendation for PFC Ayala. He stated, in so many words, that this would not be a problem. Upon returning to collect the letter of recommendation, CSM Lockwood stated that unless I could get a letter of recommendation from PFC Ayala's current BN SMG, he was unwilling to write a letter of recommendation for PFC Ayala. When I inquired into the change of attitude, he stated that he had not had sufficient interaction with PFC Ayala to be able to write a letter of recommendation. I then asked CSM Lockwood to write the letter of recommendation on the basis of their limited interaction. I pointed out that generally if a soldier has not been in sufficient trouble to attract the attention of the BN SMG, that he is probably a pretty good soldier. CSM Lockwood still declined, stating the same reasons.

10. I also made a request for a letter of recommendation from CSM Bates. I made it clear that I knew PFC Ayala was not a perfect soldier and that all I wanted was a letter of Recommendation that stated that PFC Ayala deserved the lightest sentence possible. CSM Bates took me into his office and told me that he was unwilling to write such a letter and that what was happening to PFC Ayala was beyond his control or influence. Moreover, CSM Bates advised me, in a very carefully worded manner, that some things were better left alone. CSM Bates made it clear that he understood that I felt a sense of loyalty to PFC Ayala, but that I was putting myself at risk career-wise by pushing things for PFC Ayala, and that I should weigh the risk against the limited amount of good that I could do and the importance of my career.

∎

11. CPT Gavlen had been transferred to BN staff and given separate duty to attend college pending a permanent transfer shortly after his return from Desert Storm. CPT Gavlen was supportive of PFC Ayala to the point that he had expressed interest in giving PFC Ayala an Article 15 for his offense. I only spoke to CPT Gavlen once on the phone. He declined to write a letter of recommendation based on the fact that it would be inconsistent with the chain of command.

12. In a similar manner CPT Ott declined to write a letter of recommendation because it might be considered contrary to the chain of command.

13. LTC Van Horn, who refused to see me, also refused to consider my request for a letter of recommendation for PFC Ayala. I was informed by SSG Whalen, the legal NCO for 307 ENG BN ABN, that LTC Van Horn would not write a letter of recommendation for PFC Ayala because of LTC Van Horn's support of the chain of command and that any letters of recommendation from him for PFC Ayala would be contrary to that support. He said that even though LTC Van Horn had said prior to trial that any punishment beyond that of a BCD-Special court-martial would be too harsh, the precedent had been set by the chain of command going to a general court-martial and he would not speak out against the chain of command now despite his personal feelings about the case.

14. A lot of time has passed since these conversations and I cannot remember the precise words of each person that I talked to. The meaning was clear to me though. Everyone in the chain of command

felt restrained from recommending clemency even though they felt John's sentence was too harsh.  Only SFC Penner, however, had the nerve to actually make the recommendation.

MARTIN W. SLACK
SPC, U.S. Army

Sworn to and subscribed before me this 21st day of June, 1993.

FRAN W. WALTERHOUSE
Major, JA

HARRY S. TRUMAN

INDEPENDENCE, MISSOURI

August 1, 1958

Dear Judge:

Thank you for your good letter of July 28th.  I appreciated it.

Nothing in the world could have pleased me more than your willingness to send the Library a set of the Reports of the United States Court of Military Appeals.

You know how interested I have always been in that Court and its guaranteeing justice to the ordinary fellow which, from my experience, he rarely received in military courts.

Sincerely yours,

/s/ Harry S. Truman

Hon. Robert E. Quinn
United States Court of Military Appeals
Washington 25, D. C.

HARRY S. TRUMAN

INDEPENDENCE, MISSOURI

October 15, 1958

Dear Mr. Commissioner:

Your letter of September 17th was highly appreciated, and I apologize for taking so long to answer it. I have been traveling around the country most of the time since then and have fallen behind in my personal correspondence.

The arrangement of the United States Court of Military Appeals was gone into with much effort and detail on my part. I wanted men on that court who not only understood the military approach to courts martial but who also understood justice under the Constitution of the United States and English common law. I believe that is what we succeeded in getting.

Judge Quinn sent me a complete set of the Reports of the United States Court of Military Appeals which I am very proud to add to the other papers and documents housed here in my Library.

I have been a member of courts martial, and I know exactly what the action is. I remember that in one instance the commanding general of the brigade tried to force our court to change its verdict, but we were contrary National Guard officers from Missouri, and, of course, we didn't do it. Those experiences formed my attitude about the ordinary court martial.

Sincerely yours,

/s/ Harry S. Truman

Hon. Benjamin Feld, Commissioner
United States Court of Military Appeals
Washington 25, D. C.

WISS, Judge (dissenting):

42. If an accused arrived in this Court shouting "Fire!," I would pause, look, listen, and sniff—in short, look for some objectively manifest signal that would tend to corroborate the alert. If I detected what smelled like smoke, reasonable prudence would lead me to investigate further before concluding, one way or the other, regarding accuracy of the original alarm. And make no mistake: The disconcerting, acrid smell of smoke is all that common sense would require for further inquiry; one does not have to be nipped with flames to rationally suspect the presence of fire.

43. So it is with an appellate allegation of unlawful command influence. *See United States v. Johnston*, 39 MJ 242 (CMA 1994); *United States v. Allen*, 33 MJ 209 (CMA 1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). A bare allegation will not do. An unsupported claim fails. Mere speculation goes nowhere. ¶ 19. On the other hand, it is unnecessary that the supporting evidence proverbially hit us between the eyes like a 2 x 4 in order to get our attention. "[T]he threshold triggering further inquiry should be low...." *United States v. Johnston, supra* at 244.

44. Appellant has entered this courthouse shouting "Fire!" I have paused, looked, listened, and sniffed. While I don't yet see flames, I detect more than a passing waft of smoke.

45. The following facts are significant:

Fact: The general court-martial convening authority referred appellant's case to a general court-martial, notwithstanding the recommendations of both the special court-martial convening authority and the officer who conducted the hearing under Article 32, Uniform Code of Military Justice, 10 USC § 832, that the case should be tried by special court-martial.

Fact: SPC Slack's affidavit (see Appendix A to the Chief Judge's opinion, *supra*) avers that, when he approached several of the named witnesses, their initial responses were quite positive about their willingness and ability to support appellant's clemency appeal.

Fact: Subsequently, these witnesses changed their minds, offering explanations like "good conscience" precluded what earlier had been promised as a "strong letter" (¶ 14); doing so "was not a wise career move." (¶ 15).

Fact: Command contact via Command Sergeant Major (CSM) Bates was established in the instances of several of the witnesses in question.

Fact: CSM Bates told Slack himself that Slack "was putting [him]self at risk career-wise by pushing things for PFC Ayala." ¶ 17.

Fact: In declining Slack's requests for support, appellant's company commanders during and after Operation Desert Storm explained that doing so would be "inconsistent with the chain of command." ¶ 18.

Fact: When appellant's battalion commander, LTC Van Horn was solicited for help, he refused to "speak out against the chain of command." ¶ 18.

(This is not a quotation.)

46. Quite clearly, Slack's affidavit is not a bare allegation of command influence, an unsupported claim, or mere speculation. Instead, the affidavit names names and quotes conversations. Assuming, hypothetically, the unthinkable—that there actually is command influence at work here—one must wonder what more it would take to warrant further inquiry. In my view, any failure to respond to this substantiated alarm by further inquiry into whether the smoke actually will lead to fire raises the risk of the military justice system getting burned. *See United States v. Weasler*, 43 MJ 15, 21 (1995)(Wiss, J., dissenting).

47. I cannot explain the majority's timidity that regrettably is part of a pattern of this Court's recent disposition of issues relating to unlawful command influence. *See id.* I am reluctant to conclude that my colleagues are *not* disturbed by the coincidence that *six* potential supporters all shared the belief at precisely the same time, in the same command, and involving the same accused, that it would not be healthy to act in appellant's behalf—all in the context outlined earlier. I want to know *why!*

48. This may not be fiery flames, but it surely is unmistakable smoke—and common sense fairly compels further inquiry. It may be that "[p]roof of [command influence] in the air, so to speak, will not do." *United States v. Allen*, 33 MJ at 212. Where the air is one of intimidation, however, that chills the willingness of noncommissioned and commissioned officers to perform as responsible citizens of the military community, I want to know what caused that air. Complacency puts the entire system at risk.