# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND, KRAUSS[1], and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**First Lieutenant ASA M. EVANS**
**United States Army, Appellant**

ARMY 20130647

Headquarters, Fort Bliss
Douglas K. Watkins, Military Judge
Colonel Edward K. Lawson IV, Staff Judge Advocate

For Appellant: Captain Patrick A. Crocker, JA (argued); Colonel Kevin Boyle, JA; Major Vincent T. Shuler, JA; Captain Patrick A. Crocker, JA (on brief).

For Appellee: Captain Carling M. Dunham, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Steven J. Collins, JA; Captain Carling M. Dunham, JA (on brief).

XX July 2015

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

LIND, Senior Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of two specifications of false official statement and one specification of larceny of property of a value in excess of $500.00, in violation of Articles 107 and 121, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 907, 921 (2006).[2] The panel sentenced appellant to a dismissal,

---

[1] Judge Krauss took final action in this case prior to his departure from the court.

[2] The panel acquitted appellant of one specification of fraudulent appointment and one specification of wearing an unauthorized "Special Forces Combat Patch."

confinement for one month, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

This case is before us for review under Article 66, UCMJ. Appellant raises two assignments of error.[3] One, whether the military judge abused his discretion by denying the defense motion to suppress because the government obtained a statement from appellant in violation of Article 31, UCMJ, merits discussion and relief.

**FACTS**

Appellant was convicted of two false official statement specifications alleging he: (1) submitted a dental x-ray that falsely stated was taken at a dental clinic in Afghanistan, and (2) signed a memorandum for record (MFR) that falsely stated he had dental work conducted by an Army dentist in Afghanistan. The following evidence was elicited during an Article 39(a), UCMJ, session to decide a defense motion to suppress the x-ray and the MFR.

In August 2011, appellant's battalion commander initiated an Army Regulation (AR) 15-6 investigation concerning, among other things, appellant's wear of an unauthorized combat patch. During the investigation, appellant was read his Article 31(b), UCMJ, rights and he requested an attorney. On 26 September 2011, the investigating officer finalized his report, concluding appellant had worn an unauthorized combat patch, and recommending adverse actions against appellant.

At some point between 26 September 2011 and 23 October 2011, the Brigade Judge Advocate (BJA) for appellant's unit, Major (MAJ) JH, received appellant's rebuttal matters in response to the investigating officer's conclusions and recommendations. Contained therein was a dental x-ray with appellant's name, the last four digits of his social security number, his date of birth, a location of "Bagram Air Base Dental Clinic, Afghanistan," and a date of 15 May 2010. The BJA brought appellant's rebuttal matters into his brigade commander's office and told him he "wasn't sure whether that was a real x-ray or not".[4] The BJA contacted appellant's defense counsel, MAJ JR, to ask for a sworn statement from appellant to "authenticate" the x-ray and to link it to appellant. The BJA told MAJ JR:

---

[3] We have considered those matters personally raised by appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

[4] The BJA contacted the brigade surgeon, the Chief Periodontist at Fort Bliss, MAJ BS, and current dentists from all three dental clinics in Bagram, Afghanistan. MAJ BS prepared a memorandum to the BJA which stated that there was a substantially similar x-ray of appellant's teeth in the dental records system that was taken on 27 April 2011 and that there were no records of appellant receiving dental care between April 2010 and June 2010.

> [I]f your client's saying that this is his x-ray, he should
> put that in writing and assert that, because at the time,
> when he submitted the rebuttal, all he submitted was that
> document, and it was really kind of hard for us to connect
> that document back to him if we needed to. So MAJ JR
> knew at the time that if [appellant] were to do that . . . .
> his client would be affirmatively stating—would be
> putting himself on the hook . . . . if he were to say
> affirmatively that was his x-ray.

Major JR agreed that appellant would provide a sworn statement but later advised the BJA that it was going to be an MFR. The BJA did not receive any documents directly from MAJ JR, however, MAJ JR told the BJA that "something was on the way." The BJA also wanted to "establish an objective chain of custody" for the document out of "concern" that "there would be authentication issues" if there was a court-martial.

The BJA asked appellant's senior rater, the brigade's officer in charge of operations (the S3)[5] to "collect documentation" from appellant and to verify that the documents were the information appellant wanted to submit in rebuttal. The BJA, the S3, and appellant were in the field at a base camp in White Sands at the time of the request. The S3 was aware that appellant was being investigated for "false honors," but did not think of appellant as a "suspect." The S3 understood that his role in his meeting with appellant would be "administrative" to establish a "chain of custody" for the x-ray that was allegedly submitted by appellant in his rebuttal matters. The S3 met with appellant while they were both in the field, showed him the x-ray, and asked him if the x-ray was information he previously submitted and wanted to submit as part of his rebuttal matters. After appellant answered "yes," the S3 showed him the MFR and asked "Does this meet your intent as far as what you are submitting it for?" Appellant answered "yes" and signed the MFR.[6] The S3 did not advise appellant of his Article 31, UCMJ, rights for false official statement prior to questioning him.

---

[5] Because both the BJA and S3 are named MAJ JH, we refer to them by their position rather than their initials in this opinion.

[6] The MFR contains two informational paragraphs. The first states "While deployed to the Afghanistan AOR, I had dental work conducted by [sic] Army dentist at Bahgram [sic] Army Airfield. This enclosed x-ray highlights the location and date of my dental work. See encl 1." The second states "In the respect to deployment orders or lack thereof; as told to CPT M (BN S1) my binder of important military paperwork (I LOVE ME BOOK) was part of my property that was lost and not recovered by National Van Line moving company. This company moved both my family and me from North Carolina to Fort Bliss."

The S3 testified he received an unsigned draft of the MFR from the BJA and that the BJA told him it had come from MAJ JR. The BJA, on the other hand, testified that he was not sure how the S3 had acquired the MFR or where it came from, but that he believed MAJ JR had given the unsigned MFR draft to the S3 because MAJ JR had previously informed the BJA that a statement by appellant regarding the x-ray would be executed and delivered to the brigade.

The military judge denied the defense's motion to suppress the MFR. Among the military judge's findings of fact are: (1) the S3 was appellant's direct supervisor; (2) the BJA coordinated with the S3 to be the single point of contact for the AR 15-6 investigation to receive documents from appellant because the BJA did not want to become a witness; (3) the BJA was concerned about the authenticity of the x-ray and had multiple discussions with MAJ JR about the x-ray; (4) the BJA told MAJ JR that appellant needed to execute a sworn statement if he intended to submit the x-ray in rebuttal to the AR 15-6 investigation; (5) MAJ JR advised the BJA that appellant would execute a sworn statement and deliver it to the brigade; (6) the BJA did not direct the S3 to question appellant about the allegations; and (7) the S3 subjectively believed he was confirming what matters appellant was submitting in rebuttal and not acting as an investigator. With respect to the meeting between the S3 and appellant, the military judge found as fact the S3:

> [T]ook appellant into a conference room so they could discuss the issue in private. The S3 did not advise appellant of his Article 31(b) or Miranda rights. The S3 showed appellant the subject x-ray and informed him that the command was trying to verify if he was submitting the x-ray in rebuttal. Appellant related orally he was. The S3 asked appellant if the subject MFR met his intent. Appellant related orally it did. The S3 told appellant that if the MFR met his intent, he needed to sign it, which appellant did above his signature block. The S3 did not question appellant as to whether the x-ray was authentic or false.

When discussing the law forming the basis of his legal conclusions, the military judge stated "the protections under Article 31(b) are triggered when a Soldier is questioned for law enforcement or disciplinary inquiry by a person who is acting in an official capacity." The judge recognized that whether Article 31(b) protections are triggered is an objective test and that when the questioner is appellant's supervisor there is a rebuttable presumption that questioning was done for disciplinary purposes. The presumption may be overcome when there is an administrative or operational primary purpose for the questioning. *See generally United States v. Bradley,* 51 M.J. 437, 442 (C.A.A.F. 1999).

In his conclusions of law, the military judge held that the presumption of the S3/senior rater's disciplinary capacity had been rebutted by the evidence presented at the motion hearing. He found the S3 was "not trying to elicit incriminating responses [from appellant] about the potential falsity of the x-ray," but rather only met with appellant in a "legitimate administrative inquiry" to confirm or deny whether appellant had submitted the x-ray with his AR 15-6 investigation rebuttal matters.

The judge also held that the BJA did not use the S3 "as a proxy or pretext to evade [appellant's] rights." The BJA spoke with appellant's attorney about the issue. The BJA "had no way of knowing at the time if the AR 15-6 investigation would result in a court-martial." The BJA had a responsibility to finalize the 15-6 investigation and ensure appellant's rebuttal matters were reviewed by the appointing authority, and it was this duty that was the "primary purpose" of the BJA's actions in relation to the x-ray. The judge characterized the BJA's actions as "administrative and operational, rather than disciplinary."

Finally, the judge:

> [F]ound it particularly noteworthy that [appellant] was represented by [defense] counsel and that the counsel represented to the BJA that a 'statement' by [appellant] was forthcoming to explain what matters were being submitted in rebuttal. Presumably, any statements by [appellant] to the S3 were done on advice of counsel, especially given the limited number and context of the S3's questions of [appellant].

## LAW AND DISCUSSION

We evaluate a military judge's decision regarding whether to suppress evidence for a violation of Article 31(b), UCMJ, for an abuse of discretion. *United States v. Jones,* 73 M.J. 357, 360 (citing *United States v. Ayala,* 43 M.J. 296, 298 (C.A.A.F. 1995). A judge abuses his discretion when his findings of fact are clearly erroneous or when conclusions of law are incorrect. *Id.* (citing *Ayala*, 43 M.J. at 298). In this case, Article 31(b) warnings would have been required if "(1) A person subject to the UCMJ (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected. *Id.* at 361 (citing *United States v. Cohen,* 63 M.J. 45, 49 (C.A.A.F. 2006). To trigger Article 31(b) protections, all prongs of the test must be met. The inquiries are objective and, when the supervisor is the questioner, there is a rebuttable presumption that the questioning is for disciplinary reasons. *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991); *see also United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000).

5

We conclude the military judge abused his discretion in failing to suppress the MFR. We find his findings of fact are supported by the record and he applied the correct law, however, his conclusion of law that the S3 was acting with a primary administrative purpose of confirming what matters appellant wished to submit in rebuttal to the AR 15-6 investigation was an unreasonable application of the law to the facts.[7] Appellant had already submitted his rebuttal package that included the x-ray. The BJA had already taken appellant's rebuttal package and discussed it—and his suspicions about the authenticity of the x-ray—with appellant's Brigade Commander. The BJA was investigating whether the x-ray was authentic. The BJA wanted appellant to sign a self-incriminating statement to authenticate an x-ray the BJA suspected might be false. The S3 was acting as an agent of the BJA to obtain this incriminating statement. Notwithstanding what either the S3 or the BJA may have subjectively believed, the S3 was not acting with a primarily administrative purpose. *See Swift*, 53 M.J. at 448. The AR 15-6 investigation, including submission of rebuttal matters, was complete. The solicitation of the MFR from appellant was to gather evidence regarding a potential new false official statement offense. Thus, the BJA and S3's solicitation of the MFR from appellant was for an official law enforcement purpose. The S3, who was acting at the behest of the BJA, was required to give appellant Article 31(b), UCMJ, warnings prior to procuring his signature on the incriminating MFR and eliciting any statement from appellant regarding the x-ray or the MFR.

We agree with the military judge's findings of fact that the BJA relayed his suspicions to MAJ JR, who then agreed to draft a sworn statement for appellant's signature stating he was submitting the x-ray as part of his rebuttal matters. However, the judge did not make an express finding of fact that the MFR at issue was drafted by MAJ JR. The government has the burden of proving appellant's statements were voluntarily made. Assuming the MFR was drafted by MAJ JR in consultation with appellant, the government has not provided the military judge at the time of trial or this court on appeal with any authority to suggest that a person with a duty to administer Article 31(b) warnings no longer has such a duty to warn a person suspected of an offense if the person with the duty to warn communicates his suspicions to the suspect's defense counsel, or that by such communication with defense counsel appellant somehow waives the failure to warn. Accordingly, we conclude the military judge abused his discretion by failing to suppress the MFR and statements made by appellant when he signed the MFR.

---

[7] Although the military judge did not make explicit findings of fact that the S3 was a person subject to the code; that he was interrogating or requesting a statement from appellant; and that the BJA suspected the x-ray submitted by appellant was false, we can infer such findings from his ruling. We agree with the military judge and focus our attention as to whether the S3 was acting in an official law enforcement or disciplinary capacity when questioning appellant.

Turning to prejudice, for an erroneous evidentiary ruling we determine whether there is prejudice by weighing "(1) the strength of the government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

Appellant stands convicted of two false official statements—one being the x-ray itself, and the other the MFR—and larceny of unemployment funds from North Carolina. The evidence at issue was not introduced to prove the larceny and, therefore, its erroneous admission was not prejudicial to that offense. Because the MFR was the primary evidence admitted by the government to prove the false official statement charged in Specification 1 of Charge I, we necessarily find prejudice with respect to that specification.[8] The MFR was also introduced to authenticate the x-ray that is the false official statement charged in Specification 2 of Charge I. However, we conclude that even without the MFR, the government's case with respect to that specification was strong. The S3 testified that he recognized the x-ray (prosecution exhibit 12) as "a copy of the x-ray [appellant] submitted as evidence he was in Afghanistan." The S3 knew that appellant had submitted the x-ray as part of his rebuttal package before meeting with appellant to sign the MFR. Thus, this testimony was admissible. The deputy commander of the dental clinic at Fort Bliss testified about all of appellant's dental records, that there was no record of appellant receiving dental treatment in Afghanistan, and that printed dental x-rays do not specify the location where the x-ray was taken. The defense case regarding the falsity of the x-ray was weak. While the defense presented evidence that appellant was in Afghanistan and argued that appellant's dental records may not be complete, they presented no evidence that the x-ray was valid. The MFR was not material or of high quality with respect to Specification 2 of Charge I because it was cumulative to the S3's testimony that appellant submitted the x-ray as part of his rebuttal matters. We conclude the erroneous admission of the MFR and the S3's testimony regarding his meeting with appellant did not result in prejudice as to Specification 2 of Charge I.
.

## CONCLUSION

The finding of guilty to Specification 1 of Charge I is set aside and that Specification is DISMISSED. The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the errors noted and do so after conducting a thorough analysis of the record in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16

---

[8] We reject the government's argument that there was no prejudice to the false official statement charge involving the MFR because the government could have proved the charge using evidence not admitted at trial.

EVANS—ARMY 20130647

(C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). In evaluating the *Winckelmann* factors, we find no dramatic change in the gravamen of appellant's misconduct. Appellant remains convicted of the serious larceny offense of a value over $18,000 and the remaining false official statement offense for submission of the x-ray. Appellant's penalty exposure remains the same as the military judge merged the two false official statement offenses for sentencing. We have experience with appellant's remaining convictions to allow us to reliably determine what sentence would have been imposed at trial. After reassessing the sentence and the entire record, the sentence is AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored.

Judge KRAUSS and Judge PENLAND concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

8