# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39599**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Anthony M. DA SILVA**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 25 June 2020[1]

———————————

*Military Judge:* Shaun A. Speranza.

*Approved sentence:* Bad-conduct discharge and reduction to E-4. Sentence adjudged 23 August 2018 by GCM convened at Shaw Air Force Base, South Carolina.

*For Appellant:* William E. Cassara, Esq. (argued); Captain M. Dedra Campbell, USAF.

*For Appellee:* Major Anne M. Delmare, USAF (argued); Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Mary Ellen Payne, Esquire.

Before LEWIS, POSCH, and D. JOHNSON, *Appellate Military Judges*.

Judge LEWIS delivered the opinion of the court, in which Judge POSCH and Judge D. JOHNSON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] We heard oral argument in this case on 30 October 2019.

LEWIS, Judge:

A general court-martial composed of a panel of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of violating a lawful general regulation under Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892.[2,3] The court members sentenced Appellant to a bad-conduct discharge and reduction to the grade of E-4. The convening authority deferred the reduction in grade to E-4 from 14 days after the sentence was announced until the date of action. At action, the convening authority approved the adjudged sentence.

Appellant raises six issues on appeal: (1) whether the specifications are void for vagueness from a lack of fair notice that the conduct of "making sexual advances" was subject to criminal liability; (2) whether the evidence supporting the specifications is legally and factually insufficient; (3) whether the military judge abused his discretion by allowing victim unsworn statements under Rule for Courts-Martial (R.C.M.) 1001A; (4) whether the bad-conduct discharge is an inappropriately severe sentence; (5) whether a meaningful opportunity for clemency was denied when the staff judge advocate's recommendation (SJAR) failed to advise the convening authority that he had the authority to disapprove, commute, or suspend the adjudged reduction in grade; and (6) whether trial counsel's sentencing argument was improper when he commented on Appellant's post-traumatic stress disorder.[4]

After considering the sixth issue, under a plain error standard of review as there was no objection during the sentencing argument, we find this issue warrants no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We discuss the remaining assignments of error below, find no prejudicial error, and affirm the findings and the sentence.

## I. BACKGROUND

At the time of the offenses, Appellant was an enlisted accessions recruiter in a two-recruiter office in Anderson, South Carolina. Appellant's supervisor,

---

[2] Unless otherwise indicated, all references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[3] The court members acquitted Appellant of three specifications of abusive sexual contact, alleged violations of Article 120, UCMJ, 10 U.S.C. § 920.

[4] Appellant personally asserts issue (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Master Sergeant (MSgt) SK, worked about 40 miles away in a three-recruiter office in Greenville, South Carolina. Both the Anderson and Greenville recruiting offices reported to a recruiting squadron at Shaw Air Force Base (AFB), South Carolina. Shaw AFB is about a three-hour drive from the Anderson recruiting office. The two specifications in this case arise from Appellant's interactions with two females: (1) AS[5] when she was a Recruiter Assistance Program participant (RAPper) under Appellant's supervision; and (2) ML[6] when she was an Air Force recruit[7] prior to her departure for basic military training (BMT).

Appellant began his first assignment as an enlisted accessions recruiter in June 2015 at the Anderson office. He completed a multi-week, in-residence, recruiter training course where he was taught about prohibited relationships with recruits. One government witness, a recently retired recruiter, Mr. JF, described this training as "very specific" because of "the situations we're put in as recruiters" as a means to "help prevent anything from happening." Appellant was a Technical Sergeant (TSgt) when he became a recruiter and first met and recruited AS to enlist.

In the fall of 2015, AS made the decision to join the Air Force. Appellant knew AS was married as she had listed her husband as her dependent when she signed a certification of dependents form as part of the application process.

While AS was still a recruit, Appellant would often tell her "you're really pretty." Once, Appellant commented that AS was pretty enough to get into the Air Force or words "along those lines." AS brushed off Appellant's comments by saying "thank you." AS entered the Air Force in June 2016, then completed BMT, and her career field's technical school training. In November 2016, she returned to the Anderson recruiting office to be a RAPper under Appellant's supervision for a 12-day period. Appellant was now a MSgt.

On 9 November 2016, AS accompanied Appellant on a trip to Shaw AFB for a base tour for some recruits. The tour itself was uneventful. After the group returned to Anderson, Appellant dropped off each of the recruits which left AS

---

[5] At the time of the offense and during her trial testimony, AS was an active duty enlisted member of the Air Force.

[6] At the time she testified at trial, ML was an active duty enlisted member of the Air Force.

[7] According to Air Education and Training Command Instruction 36-2909, *Recruiting, Education, and Training Standards of Conduct*, Attachment 1 (2 Dec. 2013), an "applicant" is a person who tells a recruiter that he or she is interested in joining the Air Force. "Applicant" status terminates upon signing of an enlistment contract and the individual becomes a "recruit." "Recruit" status terminates upon entry to the Air Force.

the only passenger in the vehicle. AS wanted a cheeseburger so Appellant drove to a McDonald's drive-thru in Anderson. After the drive-thru, Appellant pulled into an empty parking lot near the McDonald's. AS did not see anyone around. The two began talking.

Appellant told AS that his marriage was not going well. He disclosed that he looked up AS on Facebook and commented that she had a "nice body" and was "too pretty to be with [her] husband." AS did not feel comfortable because Appellant was technically her supervisor and she knew "you're supposed to look up to people with rank and do what they say." AS "scooted over to the door casually" because she didn't want to make it too obvious. AS started talking a lot in an attempt to deflect the conversation. AS recalled she "did a lot of rambling" before Appellant made "a comment about wanting to kiss" her.

After Appellant's comment about wanting to kiss her, AS "just kind of sat there." Appellant physically moved over the vehicle's center console and kissed her. AS "froze" and recalled being "shocked" and did not "think" she kissed Appellant back. AS described the kiss as "not a quick peck." AS remembered not knowing how to react but described what was going through her mind as "we shouldn't be doing this kind of thing."

After the kiss, Appellant said nothing. AS said to him "we could get in trouble for this," and Appellant responded "I know, but you won't tell." AS did not report what happened in the parking lot until 2017 when the Air Force Office of Special Investigations (AFOSI) contacted her as part of the investigation into Appellant's behavior with ML. AS explained her reasons for not reporting as she did not "want to bring a lot of drama" to her first base, or "be that Airman . . . [who] snitched on somebody over something stupid." AS "wanted to live a normal Airman life" and thought she could "eventually" brush off what happened and move on.

ML had wanted to join the Air Force for several years and had attempted to enlist before but was not qualified as she was underweight. In early 2017, ML was living in Anderson and revisited the idea of joining the Air Force. ML knew about military life as she had been married to a military member. She viewed the family support provided by the military as a positive. By the time ML visited the recruiting office in Anderson and met Appellant, she was a 24-year old mother of one who had attended some college and worked in several professional positions. Appellant became ML's recruiter after she visited the Anderson office.

On 10 April 2017, ML went to the Anderson recruiting office to get assistance from Appellant on "drills" and "reporting statements" in preparation for BMT. ML waited as Appellant was busy with two other recruits who were leaving for BMT that day. When Appellant finished, he invited ML and the other

recruiter in his office, Staff Sergeant (SSgt) AD, to go to lunch. When SSgt AD declined, Appellant drove ML to lunch in a government van. During lunch, Appellant discussed his relationship with his wife and explained how the relationship was not good since they had another child. Appellant stated he was going to try and divorce his wife and get an overseas assignment where he would not have to take his family. ML told Appellant that his marital issues were normal, that she had "been through that" and that "[i]t would get better."

After lunch, Appellant drove towards the Anderson office and told ML that he and his wife were "sleeping in different bedrooms" and that he had asked his wife whether they could have an "open relationship." Appellant then asked ML if she had to be back by a certain time. ML said no, so Appellant kept driving past the Anderson office and drove to a duck pond about a mile away.

Once Appellant parked at the duck pond, he told ML "I want to bang you." ML told Appellant she was not interested. Appellant took ML's lunch to-go box from her lap and grabbed her hand. ML pulled her hand away, repeated that she was not interested, and reminded Appellant that he was married. Undeterred, Appellant told ML that she did not have long before leaving for BMT so she "might as well have some fun" with him before she left. Appellant told ML that she had "porcelain skin" and was "really pretty" and that he liked the way she dressed. Appellant ran his fingers through ML's hair and continued to try and convince her to have sex with him.

Appellant was interrupted when ML received a call on her cell phone from her pastor, Mr. JS, who was also a retired Air Force officer. After a brief call with Mr. JS, ML told Appellant she needed to leave to meet Mr. JS. Appellant responded by placing his hand on ML's thigh and saying that he would give her "time to think about it." He told ML to text him using the words she "had questions" if she actually wanted to "hook up." When ML asked what to do if she really had questions, Appellant replied that he was not concerned about that. During the drive back to the Anderson office, ML asked Appellant if he was afraid to get in trouble. Appellant replied he was not because if she told anyone he would just say that she did cocaine.

Once back at the Anderson office, ML returned to her car and immediately called Mr. JS. At trial, Mr. JS described how ML sounded "upset" and that she indicated her recruiter "made some advances" and said "he wanted to bang her" and "put his hands on her legs, and that he had put his hands in her hair." Mr. JS encouraged ML to report what happened. ML was afraid to report, so she went to the house of a mentor and church member who was "like a mother" to her. After meeting with her mentor, ML reported Appellant by calling the Military Entrance Processing Station (MEPS) at Fort Jackson, South Carolina.

Mr. JF, who at that point was still on active duty in the Air Force and working at the Fort Jackson MEPS, received the call from ML.[8] In his testimony, Mr. JF recalled immediately recognizing that ML was in "some sort of distress" and "very upset." ML wanted to file a complaint as Appellant had "made a move at her, a pass at her." ML explained they were parked at a lake and Appellant made a move on her verbally and physically. Mr. JF reported ML's complaint and the recruiting squadron's first sergeant notified the AFOSI detachment on Shaw AFB.

The day after the encounter at the duck pond, AFOSI agents interviewed ML. After the interview, ML agreed to send Appellant text messages under the supervision of the agents. The text messages led to pretext recorded phone calls. In one of the recorded calls, Appellant asked ML to find a hotel and said he would pay her back. In response, AFOSI agents rented a hotel room in Anderson and made a plan to wait inside and apprehend Appellant if he arrived. The plan required ML to communicate with Appellant from a separate location while under the supervision of another agent.

On 13 April 2017, Appellant drove a government vehicle to a parking lot adjacent to the agreed-upon hotel. AFOSI agents apprehended Appellant when he entered the hotel room. A search of Appellant's gym bag revealed a box of condoms. During the lengthy drive back to Shaw AFB for Appellant's booking at the AFOSI detachment, Appellant told the agents "this is not good behavior for an Airman" and that he "is responsible" for "what he says and where he walks."

## II. DISCUSSION

### A. Constitutional Challenge to "Making Sexual Advances"

#### 1. Additional Background

Appellant was convicted of two specifications of violating a lawful general regulation by making sexual advances towards AS and ML in violation of Air Education and Training Command Instruction (AETCI) 36-2909, *Recruiting, Education, and Training Standards of Conduct*, ¶ 2.3.3.4. (2 Dec. 2013). Paragraph 2.3.3.4 prohibits "[m]aking sexual advances toward, or seeking or accepting sexual favors." *Id.* The instruction prohibits "[e]stablishing, developing or conducting *intimate or sexual relationships*. This includes, but is not limited to, dating, handholding, kissing, embracing, caressing, and engaging in sexual activities." *Id.* at ¶ 2.3.3.3. AETCI 36-2909 applies the prohibitions "to relationships <u>between</u> recruiters . . . <u>and</u> . . . recruits, [and] RAPpers." *Id.* at ¶ 2.3.2.

---

[8] Mr. JF testified that he retired in August of 2017. Trial counsel referred to him as a TSgt during voir dire and prior to calling him as a witness.

As described above, AS was a RAPper and ML was a recruit at the time of the charged offenses.

The prohibitions in paragraphs 2.3.3.3 and 2.3.3.4 of AETCI 36-2909 are similar to those listed on Department of Defense Form 2983 (DD Form 2983), *Recruit/Trainee Prohibited Activities Acknowledgment* (Jan. 2015).[9] During the application process both AS and ML signed DD Form 2983s, which were admitted as prosecution exhibits during trial. AS and ML had to "acknowledge and understand" that "as a recruit or trainee" that they would not "[d]evelop, attempt to develop, or conduct a personal intimate, or sexual relationship with a recruiter or trainer." This included, but was limited to, "dating, handholding, kissing, embracing, caressing, and engaging in sexual activities." The DD Form 2983 also required AS and ML to not "accept sexual advances or favors from, a recruiter/trainer" and that "violations . . . not granted an exception . . . may result in disciplinary action." Appellant signed the "Approved By" paragraph of the DD Form 2983s of AS and ML.

For the first time on appeal, Appellant challenges the language "making sexual advances" and argues "no federal or state law, military case law, military custom and usage, or military regulation" defines the term. In Appellant's view, he lacked fair notice, under a reasonableness standard, of what constitutes a sexual advance that would be contrary to law. Appellant notes the military judge did not define the term in his instructions to the panel. Appellant concedes that his behavior may have violated some other regulation but he maintains he was not on fair notice regarding the term "making sexual advances." He also argues that the "vagueness and ambiguity of [the two specifications was such] that Appellant does not know what he was convicted of."

The Government disagrees and argues that Appellant had fair notice from several sources including military caselaw, a military regulation—AETCI 36-2909, and recruiter training. The Government notes the evidence showed Appellant was actually aware that his behavior was prohibited when he (1) signed the two DD Form 2983s; (2) told ML that he was not concerned about getting in trouble because he would just say that she did cocaine; and (3) admitted to AFOSI agents after his apprehension that what he did was "not good behavior" and that he was "responsible" for his actions. The Government suggests the military judge and AETCI 36-2909 did not need to define the term "making

---

[9] The DD Form 2983 references Department of Defense Instruction (DoDI) 1304.33, which contains the same prohibitions. *See* DoDI 1304.33, *Protecting Against Inappropriate Relationships During Recruiting and Entry Level Training,* Enclosure 3, ¶ 1.a.(1)(a)(c) (28 Jan. 2015, incorporating Change 1, 5 Apr. 2017). Like AETCI 36-2909, DoDI 1304.33 does not further define the term "making sexual advances" or provide specific examples of a sexual advance.

sexual advances" as it already provides fair notice to a reasonable person in Appellant's position of the proscribed conduct. Finally, it argues that both specifications sufficiently state an offense and Appellant has not demonstrated that the commonly understood definitions of "sexual" and "advances" are insufficient such that specific examples or a definition of sexual advances are necessary.

### 2. Law

The Due Process Clause of the Fifth Amendment[10] "requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Due process "also requires fair notice as to the standard applicable to the forbidden conduct." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 755 (1974)). The United States Court of Appeals for the Armed Forces (CAAF) has found fair notice in "the [Manual for Courts-Martial], federal law, state law, military case law, military custom and usage, and military regulations." *Vaughan*, 58 M.J. at 31 (citations omitted). "Training, pamphlets, and other materials may also serve as sources of notice because they may give context to regulations and explain the differences between permissible and impermissible behavior." *United States v. Pope*, 63 M.J. 68, 73 (C.A.A.F. 2006) (citation omitted).

The due process concepts of fair notice and vagueness are related. *United States v. Warner*, 73 M.J. 1, 2 n.2 (C.A.A.F. 2013). "The 'void-for-vagueness' doctrine requires the criminal activity to be defined with sufficient clarity such that 'ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Caporale*, 73 M.J. 501, 504 (A.F. Ct. Crim. App. 2013) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

"The test for constitutional notice that conduct is subject to criminal sanction is one of law." *Warner*, 73 M.J. at 3. We review de novo a challenge to the lawfulness of a regulation. *United States v. Hughey*, 46 M.J. 152, 154 (C.A.A.F. 1997).

There is a presumption against the waiver of constitutional rights. *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008) (citation omitted). Appellant may waive the right to raise a constitutional issue on appeal provided it

---

[10] U.S. CONST. amend. V.

is "clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id.* (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)). In cases of forfeiture, we review for plain error where an appellant has the burden of demonstrating: "(1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted).

**3. Analysis**

As the language of this assignment of error raises the "closely related" issues of constitutional notice and void for vagueness, we analyze both and in that order. *See Warner*, 73 M.J. at 2 n.2. Before reaching the constitutional issues, we briefly address Appellant's concern on appeal that the military judge did not define the term "making sexual advances" for the court members prior to findings deliberations.

### a. Instruction on "making sexual advances"

Rule for Courts-Martial (R.C.M.) 920(e)(7) requires a military judge to instruct on "[s]uch other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, *sua sponte*, should be given." At trial, no counsel for either party or the military judge suggested the term "making sexual advances" required a definition or specific examples and Appellant did not request an instruction or object to the instruction on the elements of the offenses that the military judge did give to the court members.

Appellant's failure to request an instruction or object to the instructions on the elements of the offenses occurred after extensive discussions on the record with the military judge regarding evidentiary instructions and applicable defenses. Afterwards, the military judge provided his final instructions to the parties for review. On the record, the military judge inquired whether defense counsel had an opportunity to review the instructions. Civilian defense counsel responded "Yes, sir." The military judge then asked if counsel for either party had "[a]ny additions or objections to the final version of the findings instructions?" Civilian defense counsel replied "No, sir." Under these circumstances, we find Appellant waived an instruction to define or provide examples of "sexual advances." *See United States v. Davis*, 79 M.J. 329, 331–32 (C.A.A.F. 2020). We acknowledge our discretion to pierce waiver to correct a legal error under Article 66, UCMJ, 10 U.S.C. § 866. *See generally United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (citation omitted). We decline to disturb Appellant's waiver as we find no error when the military judge did not *sua sponte* define or provide examples of "sexual advances" as words "generally known and in universal use do not need judicial definition." *United States v. Nelson*, 53 M.J. 319, 321 (C.A.A.F. 2000) (citation omitted).

### b. Constitutional notice

We now turn to whether Appellant had fair notice that his conduct towards ML and AS was forbidden and subject to criminal sanction. As Appellant raised this challenge for the first time on appeal, we must determine whether he waived or forfeited this issue. As the right to fair notice is constitutionally protected under the Fifth Amendment, we apply the presumption against the waiver of constitutional rights. *See Harcrow*, 66 M.J. at 157 (citation omitted). We do not see an intentional relinquishment or abandonment of the right to fair notice. Therefore, we find forfeiture and apply a plain error standard of review.

We find no error, let alone a clear or obvious error, as Appellant received fair notice that sexual advances by a recruiter towards a RAPper and a recruit were both forbidden and subject to criminal sanction. We also conclude he had fair notice that the applicable standards were found in AETCI 36-2909, a lawful general regulation which he had a duty to obey. We agree with the Government that multiple sources provided fair notice to Appellant. We describe four: (1) military caselaw; (2) AETCI 36-2909; (3) his recruiter training; and (4) the DD Form 2983s that Appellant signed. We discuss the first source separately, the remaining three sources together, and then address some additional considerations on fair notice.

### i) Military caselaw

The CAAF's opinion in *United States v. Pope*, an Air Force recruiter sexual misconduct case prosecuted under Article 92, UCMJ, stands as an important source of military caselaw. 63 M.J. 68, 69 (C.A.A.F. 2006). The parties agree this case is important as both briefs cite it, though Appellant tries to distinguish it. While *Pope* is not factually identical to Appellant's case, it was published before Appellant became a recruiter and met AS and ML. We find *Pope* provided Appellant a source of fair notice that his conduct was forbidden and subject to criminal sanction.

The appellant in *Pope* was a 35-year-old male Staff Sergeant recruiter in a field recruiting office in Athens, Georgia. *Id.* at 70. The opinion explained a briefing about "the problem of sexual misconduct" the appellant and his graduating class of recruiters received "in response to a number of incidents of sexual harassment by Air Force recruiters." *Id.* The opinion described the facts underlying the appellant's Article 92, UCMJ, convictions involving three Air Force applicants. *Id.* at 70–71.

A portion of the second legal issue granted by the CAAF focused on whether AETCI 36-2002, *Recruiting Procedures for the Air Force*, paragraph 1.1.2.2.5 (18 Apr. 2000), which prohibited inappropriate conduct and unprofessional relationships, violated due process both facially and as applied. *Id.* The CAAF

held that the challenged AETCI "provided sufficient notice to [the appellant] that his conduct was subject to criminal sanction in the context of a recruiter's relationship with applicants." *Id.* at 70.

In our superior court's opinion, the CAAF noted the language of three Article 92 specifications. *Id.* at 70–71 n.1–3. Two specifications alleged "verbal conduct of a sexual nature" with an applicant "that created an intimidating, hostile, or offense environment." *Id.* at 70–71 n.1, n.3. The third specification repeated this same language but also alleged "physical conduct" of a sexual nature had occurred. *Id.* at 70 n.2. The opinion addressed that given the AETCI prohibitions "a reasonable servicemember need not have pondered whether placing his hand on an applicant's knee while riding alone with her in a car . . . or telling an applicant that her appearance was 'driving him crazy' and was 'so sexy,' were prohibited." *Id.* at 74. The CAAF found the "line of conduct" is "straight and narrow" and that "as a matter of law" the Air Force was not required to expressly set forth every example of impermissible conduct. We find that the CAAF's opinion in *Pope* was a source of fair notice to Appellant that it was prohibited for a recruiter to touch an applicant on the knee and to make comments on appearance with sexual overtones.

In an attempt to distinguish *Pope*, Appellant argues

> the [trial counsel] failed to introduce any documentary evidence regarding Appellant's education and graduation from the Recruiter Technical School, any letters or other documents such as the one from the Commander of the Air Force Recruiting Service [in *Pope*], or any testimony from fellow recruiters or instructors about the training on sexual misconduct at Recruiter Technical School and about the consequences of "making sexual advances."

We are not persuaded. Appellant cites no law that a source of fair notice under military caselaw must be cast aside simply because different evidence proved the elements of the offense in the prior case. We decline to adopt such a proposition as we find it would likely remove most, if not all, prior military caselaw as sources of fair notice. Inevitably the evidence presented in two unrelated recruiter sexual misconduct cases will differ. We address Appellant's concerns regarding the evidence used to prove the elements of his offenses when we analyze his legal and factual sufficiency challenges.

On 9 November 2016, more than ten years after the CAAF's decision in *Pope*, Appellant would drive AS to the empty parking lot near McDonald's in Anderson, South Carolina. He would tell her that she had a "nice body," was "too pretty to be with [her] husband," and he wanted to kiss her. He then moved over the console and kissed her. In our view, even with the minor factual dif-

ferences, the *Pope* opinion was a source of fair notice to Appellant that his comments about AS's appearance and his desire to kiss her, as well as the physical act of moving over the console and kissing her, were all prohibited. While AS was a RAPper and the three women in *Pope* were applicants, AETCI 36-2909, which we describe below, treated recruiter sexual misconduct towards applicants, recruits, RAPpers the same.

On 10 April 2017, Appellant drove ML to the duck pond in Anderson where he bluntly told her that he "wanted to bang her" and then proceeded to attempt to convince her to have sexual intercourse with him before she left for BMT. These verbal comments were accompanied by physical conduct of removing her lunch to-go box from her lap, placing his hand in her lap, running his fingers through ML's hair, and after a brief interruption, touching her inner thigh. In our view, the opinion in *Pope* provided Appellant a source of fair notice that his comments to ML about sexual intercourse and his associated physical conduct of touching her in a sexual manner were forbidden.

### ii) Other sources: military regulations, recruiter training, and the DD Form 2983.

Among the other sources of fair notice, we next address AETCI 36-2909 itself. The instruction was approved by the commander of AETC, a four-star general. The instruction provided ten subparagraphs of prohibited activities that a recruiter must not engage in with applicants, recruits, and RAPers. Appellant violated the 2 December 2013 version of AETCI 36-2909. This instruction was in effect when Appellant went through his recruiter training and remained in effect when he committed both offenses. The instruction contained not only prohibitions on recruiter unprofessional relationships but explained the rationale for the prohibitions. Rather than assessing the "making sexual advances" prohibition in isolation, we read it in the context of the other prohibitions. Certainly, there are areas of overlap where behaviors violate multiple prohibitions. But these areas of overlap support, rather than detract from, the prohibition against making sexual advances. On the whole, if the military caselaw left a gap in Appellant's fair notice, we find AETCI 36-2909 filled it by providing specific prohibitions, context, rationale, and a statement that violations of paragraph 2.3 or any of its subparagraphs are subject to prosecution under Article 92, UCMJ.

A third source of fair notice was Appellant's recruiter training. Mr. JF described this course as "six to eight weeks" held in-residence at "Lackland [AFB], through AETC." He described how "we go over [Air Force Instructions], proper conduct." On the topic of unprofessional relationships, Mr. JF explained the briefings are "very specific" because "sometimes we're in offices by ourselves; sometimes we're on the road with applicants." Mr. JF agreed that re-

cruiters are briefed on applicable regulations regarding professional and unprofessional relationships and are familiar with these matters before their first recruiting duty station. Mr. JF described the training as "very ongoing."

Another retired Air Force member, Mr. MB, testified about Appellant's recruiter training. Mr. MB spent 17 years as a recruiter and was in the same squadron as Appellant for about two and a half years. Mr. MB's last interaction with Appellant was as the acting first sergeant when he picked up Appellant from the AFOSI agents after his apprehension. On recruiter training, Mr. MB recalled the course lasting "either four or six weeks" and he agreed it included training on professional relationships. Mr. MB explained the "Air Force wants a professional relationship with anybody that is trying to enter the Air Force. They need to have a positive image of the Air Force that they're going to be treated professionally."

The testimony of Mr. JF and Mr. MB show that Appellant's formal and ongoing recruiter training provided him fair notice that his conduct with AS and ML was prohibited. We need not review the syllabus of his actual course, review the course materials, hear testimony from his instructor, or receive records of his training post-graduation before concluding that Appellant's training was a source of fair notice.

A fourth source of fair notice was the DD Form 2983s that Appellant "approved" for both AS and ML. This form required a recruit or trainee to acknowledge and understand eight different prohibitions. The language used closely matched the prohibitions in AETCI 36-2909 but applied to recruits and trainees. Most notably, one of the prohibitions reads that a recruit or trainee will not "[m]ake sexual advances toward, or seek or *accept sexual advances* or favors from, a recruiter/trainer." Like AETCI 36-2909, this form also lists the prohibition to "develop, attempt to develop, or conduct a personal, intimate, or sexual relationship with a recruiter or trainer. This includes but is not limited to dating, handholding, *kissing*, embracing, *caressing*, and engaging in sexual activities." (Emphasis added).

Appellant attempts to minimize the importance of the DD Form 2983 arguing "it is clear that the purpose of his signature was to indicate he witnessed ML and AS sign the forms. His signatures are not proof that he was on notice of the prohibited conduct." We disagree. The DD Form 2983 did not require a "witness" to the recruit's signature, it required a signature by someone with authority to approve the form. The DD Form 2983 provided Appellant a source of fair notice that a recruit like ML was prohibited from accepting sexual advances from him. While AS was no longer a recruit when Appellant supervised her as a RAPper, the other sources we discussed above already provided him fair notice that he could not make sexual advances towards a RAPper.

### *iii) Additional considerations*

Constitutional fair notice only required Appellant know his conduct was forbidden. It does not extend to which specific provision of AETCI 36-2909 would be utilized by the Government to prosecute him if he was caught. Indeed, the ten subparagraphs of the 2 December 2013 version of AETCI 36-2909 show the multitude of ways that recruiter unprofessional sexual relationships may manifest themselves. This is why we believe the CAAF instructed in *Pope* that the "line of conduct" is "straight and narrow" and that "as a matter of law" the Air Force was not required to expressly set forth every example of impermissible conduct. *Pope*, 63 M.J. at 74.

Similarly, we find the lack of a definition of "making sexual advances" in AETCI 36-2909 did not affect Appellant's fair notice. As noted above, words "generally known and in universal use do not need judicial definition." *Nelson*, 53 M.J. at 321. The term "sexual advances" is not unique to the law or to this area of the law. The term "unwelcome sexual advances" is part of the definition used in sexual harassment. 29 C.F.R. § 1604.11(a). The term is not further defined but "in determining whether the alleged conduct constitutes sexual harassment, the [Equal Employment Opportunity] Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." 29 C.F.R. § 1604.11(b). We have no reservations that Appellant had fair notice that his physical conduct and verbal comments—towards AS in the parking lot and ML at the duck pond—were prohibited even without a definition or list of specific examples in AETCI 36-2909.

We also have reliable evidence that Appellant had actual notice that his physical and verbal conduct towards AS and ML was forbidden. Shortly after Appellant kissed AS, she commented, "we could get in trouble for this." Appellant did not respond that his behavior was acceptable or express confusion that his behavior was allowed because AS was no longer a recruit, but a RAPper. He certainly did not claim that his kiss could not get them in trouble because it was not a "sexual advance." Instead, he replied "I know, but you won't tell." We find this evidence reasonably shows that Appellant had fair notice that his conduct with AS was forbidden but he was confident he would get away with it because she would not tell anyone.

ML provided similar testimony to show that Appellant had actual notice that his physical and verbal conduct was forbidden. There was no claim at trial that AS and ML somehow colluded on their testimony. It was undisputed that the two women did not know each other. On the drive back from the duck pond, ML then asked Appellant if he was "afraid to get in trouble." Appellant said "no" and then stated that if ML "told anyone" that he would just say that she "did cocaine." We find this evidence reasonably shows Appellant actually knew

that he could get in trouble and to keep her quiet he needed to threaten to ruin her Air Force career by saying she used cocaine.

We find no error as Appellant received fair notice that sexual advances by a recruiter towards a recruit and a RAPper were both forbidden and subject to criminal sanction. We next turn to the related constitutional challenge of void for vagueness.

### c. Void for Vagueness

Appellant did not raise a void for vagueness challenge at trial.[11] As we did with constitutional notice, we find he forfeited the issue and we test for plain error. We find no clear or obvious error as the term "making sexual advances" provided sufficient clarity such that ordinary people could understand what conduct is prohibited for recruiters. *See Caporale*, 73 M.J. at 504. We conclude that arbitrary and discriminatory enforcement is not encouraged by the lack of a specific definition or a list of examples in AETCI 36-2909 for the term "making sexual advances." *See id.*

In support of his position, Appellant contrasts the portion of AETCI 36-2002 in *Pope* which gave examples of impermissible conduct with AETCI 36-2909 which contains no examples of sexual advances. We agree with Appellant that there are no specific examples listed in AETCI 36-2909 after the term "making sexual advances" but we find a list of examples is not required. In our view, the words "sexual" and "advances" themselves, without specific examples, provided sufficient clarity for ordinary people to understand them.

Appellant's next point expands on his earlier quarrel with the lack of examples and poses a series of hypothetical questions to us in an attempt to show that the term "making sexual advances" is unconstitutionally vague:

> Does the prohibited conduct include oral statements, physical contact, or both? Must the oral statements specifically reference sexual contact or does innuendo suffice? Does the prohibited conduct include in-person conversations, text messages, communication via social media, or something else? Which body parts are involved with sexual advances – genitals, sexual organs, breasts, and anuses? Or does the prohibited conduct include other parts of the body? Does the prohibited conduct require an intent, and if so, what kind of intent?

---

[11] Appellant also did not request a bill of particulars under R.C.M. 906(b)(6). One of the purposes of a bill of particulars is to inform the accused of the nature of the charge to "enable the accused to plead the acquittal or conviction in bar of another prosecution for the same offense when the specification itself is too vague and indefinite for such purpose." R.C.M. 906(b)(6), Discussion.

We need not answer Appellant's hypothetical questions. As the CAAF explained in *Pope*,

> In another context it may be prudent to have specific prohibitions illustrated with examples in order to identify criminal conduct; however the question here is whether the regulation is constitutionally vague as applied to a recruiter's conduct with applicants. . . . AETCI 36-2002 is clear that sexual conduct by recruiters with applicants is prohibited, and recruiters must be "totally professional in their relationships with applicants." AETCI 36-2002, paragraph 1.1.2.2.5. It was not necessary for the Air Force recruiting instruction to identify every possible nook and cranny in the line of conduct, for the line is straight and narrow. . . .
>
> For example, recruiters are prohibited from "attempting to date any applicant" or "making sexual advances towards applicants." [*Id.*] at 1.1.2.2.5.3; 1.1.2.2.5.2. . . .
>
> Given the evolving and innumerable ways in which sexually offensive conduct may occur in the recruiting context, the Air Force was not required, as a matter of law, to expressly set forth all conceivable instances of impermissible conduct.

63 M.J. at 74.

We find the CAAF's analysis in *Pope* applies to Appellant's case, even though the two cases involve different AETCIs. Of note, in *Pope* the CAAF looked to the surrounding provisions of AETCI 36-2002, including the specific provision on "making sexual advances." *See id.* We doubt the CAAF would have quoted the provision on "making sexual advances" in their analysis if it was unconstitutionally vague, required its own definition, or could only be understood by an ordinary person with a detailed list of examples.

Appellant next points to a comment by the military judge after findings in support of his vagueness argument. The military judge's comment arose during consideration of unsworn statements of AS and ML and whether they impeached the not guilty verdict on the Article 120, UCMJ, offenses. In that context, the military judge commented:

> [T]his does not impeach the verdict in any way. Again, I provided the instruction on mistake of fact as to consent. Again, we're not going to know upon what theory [Appellant] was acquitted of those specifications, or alternatively, found guilty of making sexual advances in violation of a lawful general regulation.

In Appellant's view, if the military judge did not know what sexual advances Appellant was convicted of committing then the specifications are void for vagueness. We are not persuaded. We view the military judge's comment in its context, ruling on an objection on whether unsworn statements impeached the verdict. We decline to interpret the military judge's comment as indicative of any position on whether the specifications were void for vagueness. Such a challenge was never raised before the military judge so he had no opportunity to address it.

After considering Appellant's arguments on void for vagueness, we find no clear or obvious error. We determine that the term "making sexual advances" given its ordinary meaning and taken in context of the other prohibitions provided sufficient clarity for an ordinary person to understand what conduct is prohibited. As we described above in fair notice, when Appellant was questioned by AS and ML about getting in trouble, he showed that he actually had sufficient clarity and understanding. We conclude that AETCI 36-2909, paragraph 2.3.3.4, does not encourage arbitrary and discriminatory enforcement and that ordinary people would understand the prohibition of recruiters "making sexual advances" towards recruits and RAPpers without further legal definition or list of examples.

## B. Legal and Factual Sufficiency

### 1. Additional Background

Appellant claims that none of his conduct was sexual in nature and therefore he was not "making sexual advances." For AS, Appellant states a "consensual kiss, if it occurred, is not necessarily a sexual act" and "the [G]overnment failed to prove . . . that the act of Appellant touching AS's lips with his lips was a 'sexual advance.'" Appellant argues the kiss was consensual because: (1) AS told the AFOSI agents that she kissed Appellant back; and (2) AS testified at trial that it was possible that she kissed Appellant back. Appellant notes there was no evidence introduced of text messages, emails, calls, or other communications to AS with sexual content or innuendo.

For ML, Appellant asserts that even assuming *arguendo* that he touched ML's arm, leg, and hair, ML did not testify these acts were sexual. Appellant argues that ML was an unreliable witness who (1) lied in her testimony about taking the ASVAB[12] a second time; (2) fabricated the allegations to secure a better job in the Air Force; and (3) used her status as an alleged victim to benefit herself. Finally, Appellant argues his attempt to meet ML at the hotel with

---

[12] The Armed Services Vocational Aptitude Battery (ASVAB) exam is required before applying to join the Air Force as an enlisted Airman.

condoms is irrelevant to whether Appellant made sexual advances towards ML two days earlier at the duck pond.

The Government responds that Appellant's behavior was sexual in nature towards both AS and ML. For AS, the Government asserts the correct question is not whether the sexual advances were reciprocated, but whether Appellant made them. The Government argues Appellant's words and actions were clear sexual advances towards AS and she had no bias or motive to fabricate. For ML, the Government argues Appellant made sexual advances as Appellant "literally asked to have sex with ML, and then touched her hair and grabbed her inner thigh." On the credibility concerns raised about ML, the Government argues whether ML took the ASVAB a second time or pursued a specific Air Force job have little bearing on her credibility. The Government argues ML's immediate report and the corroboration in the pretext messages and phone calls showed Appellant's intent to seek a sexual relationship with ML at the duck pond.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element

beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

For the Article 92, UCMJ, offenses the Government had to prove beyond a reasonable doubt that (1) there was in existence a certain lawful general regulation, specifically paragraph 2.3.3.4 of AETCI 36-2909, dated 2 December 2013; (2) Appellant had a duty to obey such regulation; and (3) at the time and place alleged, Appellant violated this lawful general regulation by wrongfully making sexual advances towards ML and AS[13] respectively. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 16.b.(1).

### 3. Analysis

Appellant does not challenge that AETCI 36-2909, paragraph 2.3.3.4, is a lawful general regulation. He does not challenge that he had a duty to obey it. He only challenges the evidence supporting the third element of each offense.

#### a. AS

Viewing the evidence in the light most favorable to the Government, a reasonable factfinder could have concluded that Appellant kissed AS and his words and conduct prior to the kiss demonstrated he made sexual advances towards her. After the recruits had been dropped off and a stop was made at the McDonald's drive-thru, Appellant chose to drive to a nearby empty parking lot. A reasonable factfinder could determine that the decision by Appellant to leave the McDonald's for a more isolated location was deliberate and indicative of his intent that he needed a more private location for what he planned to do next.

Turning to the actual incident, a reasonable factfinder could have believed AS when she testified that Appellant told her she had a nice body and that she was too pretty to be with her husband. At this point, AS "got . . . this feeling like something's going to happen" and casually moved away from Appellant without being "too obvious." A reasonable factfinder could have believed AS also attempted to dissuade Appellant from proceeding further by rambling to take the conversation in a different direction. Instead, Appellant told AS that he wanted to kiss her and his actions confirmed this as he physically moved over the vehicle's console. A reasonable factfinder could have determined Appellant's sexual advances towards AS were complete and that it did not matter whether AS "possibly" returned his kiss or told the AFOSI agents that she "probably" returned it.

---

[13] The specification further identified AS by her military grade.

Appellant invites us to explore whether the kiss was a "sexual act." The words "sexual act" were not charged in the specification and Appellant appears to be arguing that we should look to Article 120, UCMJ.[14] We disagree. The common usage of the words "sexual" and "advance" are notably broader than the legal definition of "sexual act" in Article 120, UCMJ. Rather than looking to uncharged words, we note that AETCI 36-2909, paragraph 2.3.3.3, specifically prohibited "kissing" between a recruiter and RAPper, consensual or not.

A reasonable factfinder may have found Appellant made sexual advances towards AS after evaluating the evidence presented including the location, the circumstances, the words Appellant spoke, and the physical movements Appellant made. A reasonable factfinder could have also evaluated the various reactions of AS once in the empty parking lot and concluded that Appellant's sexual pursuit of her was quite obvious, as he explicitly revealed his desire to kiss her and followed through by doing so.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of violation of a lawful general regulation, by making sexual advances towards AS, beyond a reasonable doubt. *See Barner*, 56 M.J. at 134 (citations omitted). Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for violation of paragraph 2.3.3.4 of AETCI 36-2909 by making sexual advances towards AS is both legally and factually sufficient.

### b. ML

In the light most favorable to the Government, a reasonable factfinder could have concluded that Appellant made sexual advances towards ML at the duck pond. The two were alone in the van that Appellant drove to the duck pond. A reasonable factfinder could have believed ML when she testified that Appellant stated he wanted to "bang her," removed her to-go box from her lap, grabbed her hand, touched her hair, and attempted to convince her that she should have sex with him before she left for BMT. A reasonable factfinder could also have believed ML's testimony that after the interruption of the phone call from her pastor, Mr. JS, Appellant's response was to touch ML's inner thigh and tell her that she would have time to think about it—meaning having sex with him. Under these circumstances, a reasonable factfinder could have also concluded that the verbal and physical conduct described above were sexual advances by Appellant.

---

[14] 10 U.S.C. § 920(g)(1) defines the term "sexual act."

A reasonable factfinder could have considered the various challenges to ML's credibility and determined that they did not raise reasonable doubt regarding the elements of the offense. The court members could have considered them and then reasonably looked to the evidence supporting ML's testimony: (1) her immediate report to her pastor, Mr. JS; (2) her telephone report to Mr. JF at MEPS; (3) her report to AFOSI agents; and (4) the pretext messages and phone calls which confirmed Appellant's interest in ML. Finally, Appellant's willingness to have ML book a hotel for a rendezvous and his decision to travel to the hotel with condoms—a mere two days after the duck pond encounter—provided powerful circumstantial evidence that his earlier advances not only occurred but were sexual in nature.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of violation of a lawful general regulation, by making sexual advances towards ML, beyond a reasonable doubt. *See Barner*, 56 M.J. at 134 (citations omitted). Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for violation of paragraph 2.3.3.4 of AETCI 36-2909 by making sexual advances towards ML is both legally and factually sufficient.

## C. Victim Unsworn Statements

### 1. Additional Background

During sentencing, the military judge considered a defense objection to whether AS and ML could provide victim unsworn statements under R.C.M. 1001A for an Article 92, UCMJ, violation. Civilian defense counsel argued "the victim of an Article 92 violation of a general order is technically the Air Force." The trial counsel disagreed arguing that both AS and ML described "direct emotional harm" as a result of the Article 92, UCMJ, violations and this was sufficient under R.C.M. 1001A(b)(1). The military judge ruled that AS and ML "do qualify as crime victims, even though this is an Article 92 violation. Again the evidence has presented, at least in findings, they did testify that they did suffer some direct, at least, emotional harm as a result of the sexual advances [Appellant] made against them."

Once AS and ML's written unsworn statements were marked as court exhibits, trial defense counsel raised objections to the contents of both statements. For ML's unsworn statement, the objection that was made at trial is not raised on appeal so we decline to address it further.[15]

Civilian defense counsel then objected to the portions of AS's statement where she wrote: "He violated me, he violated my body . . . And he did it without my consent." The Defense also objected to a second reference to the words "he violated me." The Defense argued these statements were not victim impact as they went "beyond the rules of the psychological, financial, or physically injuries she suffered as a result of what he's been convicted." The military judge permitted the special victims' counsel (SVC) for AS to respond. The SVC argued that AS "still maintains" that she did not consent and "that she felt violated." The SVC argued that Appellant violated AS's trust "as her recruiter." After further discussion, the military judge overruled the Defense's objection to the contents of AS's written unsworn statement.

In addition to the written unsworn statements, both AS and ML delivered oral unsworn statements. ML read her written unsworn but AS delivered a shorter and different oral unsworn statement. AS stated that Appellant "really violated my trust" and that she does not "feel comfortable around male [noncommissioned officers], or males in general, in the Air Force, because of the violation that he [did] to me." AS did not repeat the words from her written unsworn statement which mentioned "he violated her body" or "he did it without my consent."

After the court members heard the oral unsworn statements and received the court exhibits, in a session without the members, the military judge provided further explanations of his earlier rulings on whether AS and ML were crime victims and whether each provided proper victim impact. His rulings were "unchanged" but the military judge noted the issue of the applicability of Mil. R. Evid. 403 to victim unsworn statements remained "an open issue" under caselaw.[16] The military judge then found the information provided to the

---

[15] The Defense objected to the line "I have had to deal with my integrity and character being attacked." Civilian defense counsel argued the statement was "directly commenting on our client's constitutional right to a trial, right to confront witnesses." We decline to address this objection further as the record of trial shows challenges were made to ML's credibility and character after she reported Appellant as she navigated the enlistment process and the beginning of her Air Force career.

[16] The military judge was describing the *Hamilton* case which at the time had been decided by our court and the CAAF had granted a petition but had not yet heard argument on or decided. *See United States v. Hamilton*, 77 M.J. 368 (C.A.A.F. 2018); *United States v. Hamilton* 77 M.J. 579 (A.F. Ct. Crim. App. 2017), *aff'd*, 78 M.J. 335 (C.A.A.F. 2019).

members was not "substantially outweighed by any danger of unfair prejudice contemplated by [Mil. R. Evid.] 403."

The military judge instructed the court members that the unsworn statements were "an authorized means" of AS and ML "to bring information to the attention of the court, and must be given appropriate consideration." The military judge also instructed

> [t]he weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member. You may consider that the statement is not under oath, [its] inherent probability, or improbability, whether it is supported by or contradicted by evidence in this case, as well as any other matter that may have a bearing upon its credibility. In weighing an unsworn statement you're expected to use your common sense, and your knowledge of human nature, and the ways of the world.

On appeal, Appellant argues the military judge erred by (1) permitting AS and ML to deliver unsworn statements when the Air Force was the victim of the offenses; and (2) permitting AS and ML to exceed the scope of victim impact information. On his second point, Appellant claims the military judge permitted AS to impeach the verdict as Appellant was acquitted of the Article 120, UCMJ, offense of abusive sexual contact by kissing her without her consent and we cannot know under what theory the court members acquitted Appellant of this offense.[17] Finally, for the first time on appeal, Appellant claims the military judge also erred by permitting ML's oral and written unsworn statements to include a statement that "Every time I see a [senior noncommissioned officer], I wonder if they use that rank to try and have sex with young, and impressionable Airmen."

Appellant argues the military judge's errors substantially influenced the adjudged sentence. He cites an "exceptionally weak" government case-in-chief and an "equally weak" government sentencing case. He characterizes the Defense's case-in-chief as "notably strong" referencing the Article 120, UCMJ, acquittals and a defense sentencing case that "portrayed a phenomenal senior [noncommissioned officer] lauded by his peers, supervisors, and instructors for his unmatched devotion to duty." Appellant claims the statements of AS and ML were material and "the linchpin of the [G]overnment's sentencing case" and their quality affected the sentence.

The Government responds that AS and ML are both crime victims as they were named in the specifications of which Appellant was convicted and both

---

[17] Appellant made a similar argument in his void for vagueness challenge.

suffered emotional harm. The Government argues the content of the various unsworn statements were within the scope of R.C.M. 1001A. Finally, the Government asserts that even if we find error, the unsworn statements did not substantially influence the sentence. The Government characterizes its sentencing case as "strong" based on the gravity of the offenses and acknowledges the length of Appellant's career and its positive character but argued this cuts both ways as it shows he knew what he was doing was wrong. The Government draws no distinction between verbal and written unsworn statements in assessing their materiality and quality.

**2. Law**

Article 6b, UCMJ, grants victims of offenses under the UCMJ the right to be reasonably heard at a sentencing hearing related to the offense. 10 U.S.C. § 806b(a)(4)(B). A victim covered by this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." 10 U.S.C. § 806b(b).

Under R.C.M. 1001A, victims in non-capital cases may exercise their right to be reasonably heard through sworn or unsworn statements. R.C.M. 1001A(b)(4)(B). Unsworn statements may be oral, written, or both. R.C.M. 1001A(e). A "crime victim" is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." R.C.M. 1001A(b)(2).

Statements offered under R.C.M. 1001A "may include victim impact or matters in mitigation." R.C.M. 1001A(c). Victim impact under R.C.M. 1001A means "any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

"Interpreting R.C.M. 1001A is a question of law, which we review de novo." *United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018) (citation omitted). However, we review a military judge's decision to accept a victim impact statement offered pursuant to R.C.M. 1001A for an abuse of discretion. *Id.* at 383 (citing *Humpherys*, 57 M.J. at 90). "The 'judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect.'" *Humpherys*, 57 M.J. at 90 (quoting *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). In the absence of an objection at trial, we review claims of erroneous admission of a victim unsworn statement for plain error, which is established when: (1) there is error; (2) which was plain, clear, or obvious, and (3) the error resulted in material prejudice to Appellant's substantial rights. *See United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007) (citations omitted).

When there is error regarding the presentation of victim statements under R.C.M. 1001A, the test for prejudice "is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). This is determined by evaluating the relative strength of the parties' cases along with the materiality and quality of the evidence in question. *Id.* (citation omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Id.* (citation omitted).

### 3. Analysis

#### *a. Were AS and ML crime victims?*

We agree with the military judge that both AS and ML met the definition of a "crime victim" under R.C.M. 1001A and therefore had the right to be reasonably heard during Appellant's sentencing hearing. We disagree with Appellant that the Air Force was the sole victim of the Article 92 offenses.

Our decision should not be read too broadly. We are certainly not holding that every recruit or RAPper who finds themselves in an unprofessional relationship with a recruiter automatically meets the definition of a crime victim. In our view, the military judge must make an individual decision about each person who seeks to exercise their right to be reasonably heard. *See, e.g.*, *United States v. Dunlap*, No. ACM 39567, 2020 CCA LEXIS 148, at *19 (A.F. Ct. Crim. App. 4 May 2020) (unpub. op.) (explaining that in an adultery conviction the non-offending spouse may be a victim under Article 6b, UCMJ, and R.C.M. 1001A depending on the facts of a given case).

We find support for our conclusion from our sister-service court in a case where the appellant was a drill instructor and some of the offenses involved Article 92, UCMJ, violations of a "Recruit Training Order." *United States v. Felix*, No. 201800071, 2019 CCA LEXIS 258, at *1–2 (N.M. Ct. Crim. App. 19 Jun. 2019) (unpub. op.). To be clear, the court in *Felix* did not need to answer the same question we have before us. However, after determining the military judge abused his discretion by allowing one particular unsworn victim impact statement, the *Felix* court assessed prejudice and reviewed the contents of the other victim impact statements. *Id.* at *38–39. One unsworn written statement was from Recruit AG who was among "three of the appellant's victims" and who had developed a medical condition from "excessive incentive training ordered by the appellant" which resulted in his discharge. *Id.* at *41–42. It appears to us that it was a foregone conclusion to our sister court that Recruit AG was a crime victim when his drill instructor failed to obey a lawful order and he suffered, at a minimum, direct physical and pecuniary harm.

Finally, we find support from one of our own decisions, albeit in another context—post-trial processing. Three years ago, we found no error under R.C.M. 1105A when a staff judge advocate solicited a victim impact statement from a course student when her instructor was convicted of dereliction of duty under Article 92, UCMJ, for an unprofessional relationship with the student. *United States v. Brooks*, No. ACM S32394, 2017 CCA LEXIS 190, at *13–14 (A.F. Ct. Crim. App. 22 Mar. 2017) (unpub. op.). We rejected the argument that the student was not a victim observing:

> The UCMJ and Rules for Courts-Martial define "victim" broadly, and it is entirely foreseeable that [she] might have suffered direct emotional or pecuniary harm as a result of [the] dereliction of duty. [The appellant] was [her] superior both by virtue of his rank and his position as her instructor.

While *Brooks* involved a different phase of trial and interpretation of a different rule, we find the definitions of crime victim under R.C.M. 1001A and R.C.M. 1105A to be quite similar.

The military judge correctly concluded that AS and ML were crime victims under R.C.M. 1001A. We now turn to the contents of the victim impact statements.

### b. Content of AS's unsworn statements

We can quickly dispense with the contents of AS's shorter, oral unsworn statement. AS said that Appellant "really violated [her] trust" and mentioned "the violation that he [did] to me" but did not reference violations of her body or the words "without my consent." We find the contents of AS's oral unsworn statement fall squarely within the definition of victim impact under R.C.M. 1001A(b)(2) and directly related to or arose from Appellant's conviction for making sexual advances towards her.

Closer questions are presented with the content of AS's written unsworn statement where she referenced that it was her body that was violated, and a reference that Appellant "did it without my consent." To be clear, we have no doubt these words accurately describe exactly how AS felt. On the other hand, it is not unreasonable for Appellant to argue these words are actually a description of how AS felt about an offense for which he was acquitted. It is these two possible interpretations that cause us concern, particularly in a members case.

The military judge was certainly aware that he could limit the content of a victim unsworn statement. He cited our decision in *United States v. Roblero* and described that case as one where we "found that the judge in fact did abuse his discretion in allowing completely improper . . . information to be presented in the unsworn statement." No. ACM. 38874, 2017 CCA LEXIS 168, at *18

(A.F. Ct. Crim. App. 17 Feb. 2017) (unpub. op.). We explicitly stated in *Roblero* that "Article 6b is not a blanket authorization for a victim to state to the sentencing authority whatever he or she might desire." *Id.* The military judge did hear argument from the SVC who noted this was a single incident for AS that led to two different charges and that AS still maintained that she did not consent. The military judge also recognized that no one was ever going to know why Appellant was acquitted of abusive sexual contact against AS.

When faced with these situations, we see the military judge's responsibility as two-fold: (1) ensuring AS's right to be reasonably heard is protected within the parameters of R.C.M. 1001A; and (2) ensuring that if the court members are allowed to hear victim impact information that could be reasonably interpreted by the court members as a comment about an acquitted offense that they are instructed they cannot do so. Here, the military judge provided the standard unsworn statement instruction and determined no more was required because AS's statement "was not evidence." We are not so certain.

We think the preferable course of action for military judges should be to tailor the unsworn statement instruction. This preserves a crime victim's right to be reasonably heard while ensuring court members do not wrongly interpret victim impact information that they "must consider." SVCs should be attuned to these concerns and prepared to offer the military judge a tailored instruction which protects their client's right to be reasonably heard while simultaneously making sure that appellate error is not unnecessarily introduced because their client's statement could be reasonably viewed as commenting on an acquitted offense. In this case, we will only assume, without deciding, that the military judge abused his discretion when he permitted AS's written unsworn statement to include the statements "he violated my body" and "he did it without my consent" without a clarifying instruction to the court members on the limits under which they could consider these victim impact statements. As we assume without deciding that there was error with a portion of AS's written unsworn statement, we will test for prejudice below.

### c. Content of ML's unsworn statements

The contents of ML's oral and written unsworn statements were substantially the same. Appellant now argues the military judge erred by allowing ML's written and oral unsworn statements to include the statement "Every time I see a [senior noncommissioned officer] I wonder if they use that rank to try and have sex with young and impressionable Airmen." At oral argument, Appellant argued his overarching objection to ML's statement was sufficient to preserve the issue. We are not persuaded. As we see it, an objection about who is a "crime victim" under R.C.M. 1001A(b)(1) is different than an objection to whether the contents of a statement qualifies as "victim impact" under R.C.M.

1001A(b)(2). At a minimum, Appellant forfeited his objection when he did not object to the content he is concerned about on appeal.

We consider this issue under plain error and find none. The military judge had ample evidence from findings that Appellant tried to convince ML to have sex with him at the duck pond. The military judge could readily conclude that this was one of the sexual advances of which Appellant was convicted. Under R.C.M. 1001A(b)(2), ML could exercise her right to provide victim impact information including the psychological and social impacts that directly related to or arose from Appellant's sexual advances towards her. ML's statement simply described what crossed her mind now having experienced her recruiter making sexual advances towards her. It does not matter that her perception involves others in the military or other males. What matters is that this impact was directly related to or arose from Appellant's sexual advances. We see no clear or obvious error that this statement by ML was outside the scope of victim impact information under R.C.M. 1001A(b)(2).

### d. Prejudice

We now address whether the portions of AS's written unsworn statement described above substantially influenced the adjudged sentence by evaluating the relative strength of the parties' cases along with the materiality and quality of the evidence in question. *See Barker*, 77 M.J. at 384 (citation omitted). The Government's findings evidence on the Article 92 offenses was strong. Both AS and ML described not just the sexual advances Appellant made, but how they felt during and after them. AS and ML also testified why Appellant had no concerns about getting in trouble. All of this evidence was available for the members to consider during sentencing. On the other hand, the Government presented no additional victim impact evidence under R.C.M. 1001(b)(4) or evidence in aggravation during sentencing. Appellant's performance reports were exceptional and his one letter of counseling for a fitness failure was admissible but unremarkable. We characterize the overall strength of the Government's case as solid.

The Defense was not required to put on a case during findings. They chose to, so we will assess it. The Defense contended that no sexual advances were made towards AS. This was an uphill battle and was ultimately unsuccessful. For ML, the Defense made more credibility challenges but these were offset by a recent report and Appellant's own text messages and recorded phone calls. The evidence that Appellant traveled to a hotel room to meet ML two days after the duck pond incident resoundingly confirmed ML's testimony of his sexual interest in her. We find the Defense's findings case on the offenses for which he was convicted was weak. We need not address the strength of the Defense's case on the acquitted offenses. The military judge instructed the members that Appellant was "to be sentenced only for the offenses of which he has been found

guilty" and we presume that instruction was followed in the absence of evidence of the contrary. *Washington*, 57 M.J. at 403 (citation omitted).

The defense sentencing case in mitigation was very strong. Appellant's personnel records, two periods of combat service in Iraq, character statements, and the opinions on rehabilitative potential were very positive. There was limited extenuation evidence regarding Appellant's marital troubles and work related pressures at the time of the offenses. Appellant provided in depth apologies to his fellow recruiters in the wake of being caught. At trial, he provided a cursory apology to AS and ML and asked for their forgiveness. When considered together, we characterize the strength of the Defense's findings case on the convicted offenses and their sentencing case as solid. On the whole, where the Defense case was strong, the Government was weak and vice versa.

The final two factors of the prejudice analysis, materiality and quality, require us to essentially assess "how much the erroneously admitted evidence may have affected the court-martial." *See United States v. Washington*, ___ M.J. ___ , No. 19-0252, 2020 CAAF LEXIS 296, at *12 (C.A.A.F. 29 May 2020). We are to consider the particular factual circumstances of each case and previous considerations including the extent to which (1) the evidence contributed to the Government's case; (2) instructions to the panel may have mitigated the error; (3) the Government referred to the evidence in argument; and (4) the members could weigh the evidence using their own layperson knowledge. *See id.* (citations omitted).

We do not find the portions of AS's written statement contributed significantly to the Government's case. AS did not repeat those portions when she gave her oral unsworn statement directly to the members and she adjusted and only used the word "violated" in a narrower and permissible context—trust.

The military judge gave a proper instruction to the court members that the unsworn statement was "an authorized means" for AS "to bring information to the attention of the court, and must be given appropriate consideration." The military judge reminded the members that the statement was not under oath and it was not subject to cross-examination, or to questioning by the members. The military judge also instructed the members to consider the statement's inherent probability, or improbability; and whether it was supported or contradicted by the evidence in this case. A similar instruction was given regarding Appellant's unsworn statement. These instructions set the unsworn statements apart from the evidence in the case. This reduced the impact of the words AS wrote for the members.

The content at issue was scattered among three paragraphs which also contained other permissible victim impact information. In the paragraph where AS wrote about Appellant violating her and her body, she also wrote that (1)

Appellant had violated her trust, but more importantly he tainted her Air Force career; and (2) he changed the way that she viewed individuals—especially senior noncommissioned officers. In the paragraph where AS mentioned "he did it without my consent" she also wrote that (1) she showed up at her first base with a negative opinion of senior noncommissioned officers; and (2) she has a "lack of respect for them" but she treats them with respect because she is told to and not because "she actually feels that respect anymore." In AS's last reference to Appellant violating her, she also wrote (1) he was the first face that greeted me into what was supposed to be the Air Force family; and (2) he was in a "position of power over me and he used that position to try to get what he wanted. That's not a very warm welcome . . . and that's why I'm not sure I will stay." The presence of proper victim impact information, which described significant long term social and psychological impacts on AS, had greater materiality and quality than the statements we are assessing.

The trial counsel did not mention during sentencing argument the statements at issue. Trial counsel provided other justifications for his sentencing recommendation and referenced only small portions of AS's statements including AS "has a negative opinion of NCOs. She has no pride in being an Airman." After sentencing argument, the military judge directly instructed the members that Appellant could only be sentenced for the offenses of which he had been found guilty. We are certain the court members did not forget that they just acquitted Appellant of abusive sexual contact of AS the day prior.

We might be more concerned with materiality and quality if (1) this was the first and only time the members heard from AS; (2) she provided new ammunition against Appellant such as uncharged misconduct; (3) she was the only victim in the case; or (4) the trial counsel argued these portions of her statement as justification for the sentence recommendation. These concerns are not present in this case. After evaluating the four factors, we do not find that the assumed error substantially influenced the adjudged sentence. *See Barker*, 77 M.J. at 384 (citation omitted).

### D. Sentence Appropriateness

#### 1. Additional Background

Appellant argues that the bad-conduct discharge is unduly harsh and an inappropriately severe sentence. He cites a "superb" service record both as a recruiter and as a career mental health services professional and board-certified alcohol and drug abuse counselor. Among his many distinguished awards are his 2006 annual award as the Air Force's Outstanding Mental Health Technician of the Year and his 2012 annual award as the Air Force Medical Service's Outstanding Mental Health NCO of the Year. Appellant also presented positive character letters, provided information about his combat service in

Iraq, and sworn testimony that he "undoubtedly," "absolutely," and "without question" had rehabilitative potential. Appellant delivered a written and oral unsworn statement and requested the court members allow him to continue to serve in the Air Force.

The Government argues that the sentence is not inappropriately severe. The Government notes the maximum punishment Appellant faced was a dishonorable discharge, four years of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1. The trial counsel suggested an appropriate sentence would include a bad-conduct discharge, five months of confinement, and reduction to the grade of E-4. The Government acknowledges Appellant's "prior good record" and 15-year career and accomplishments were before the court members but asserts so too were the nature and seriousness of the offenses.

While not raised as a separate assignment of error, Appellant argues—in the context of sentence severity—that a defense witness, MSgt SK, was improperly cross-examined during his sentencing testimony. The Government argues that the military judge did not abuse his discretion in ruling on the objection, provided a proper instruction that is not challenged by Appellant, and court members are "presumed to follow instructions, until demonstrated otherwise." *Washington*, 57 M.J. at 403. We describe the cross-examination and the resulting series of events below.

MSgt SK, who supervised Appellant, testified under oath as a defense witness. He also wrote a two-page written character statement that had already been admitted as a defense sentencing exhibit. The letter was glowing in its assessment of Appellant and identified his various positive character traits. The letter stated, "If allowed, I greatly look forward to having him back on my team in the Air Force in this capacity or any other."

During cross-examination, the trial counsel asked MSgt SK if he was "aware that [Appellant] actually had sex with another one of his female recruits" who subsequently "withdrew her application from the Air Force." MSgt SK testified that he was not aware of either matter, without objection. When trial counsel attempted to ask a third question—"would knowing that change your character statement about [Appellant]"—the Defense asked for a hearing outside of the court members' presence.

After an exchange with the military judge, the Defense agreed their objection was "essentially" that the trial counsel did not have a good faith basis for any of the questions. In response, the trial counsel explained the good faith basis for the information was obtained from "an in depth interview with one of the witnesses." Defense counsel then modified his objection to "this would be improper impeachment technique." The trial counsel eventually cited Mil. R.

Evid. 405(a)[18] as permitting this type of inquiry. The Defense then returned to their earlier objection that it was "the good faith basis issue . . . [as] we don't know the reliability of the statement."

The military judge indicated he was "going to overrule" the objection under Mil. R. Evid. 405 because the trial counsel was permitted to challenge the basis of the witness' opinion. After more discussion, defense counsel said "if [trial counsel] is saying that a witness, directly heard [Appellant] saying this, then that is a good faith basis." The military judge again stated he was going to overrule the objection.

When the members returned, MSgt SK testified again that he was unaware of the entire situation with the woman who withdrew her application from the Air Force. Trial counsel then asked, "Does it change your impression of [Appellant's] character." MSgt SK answered, "It's disturbing because I didn't know that about him, or that [it] happened, but from what I do know about [Appellant], he's an incredible person, not just a senior NCO."

At the conclusion of MSgt SK's testimony, one of the court members asked whether the statement about Appellant "having sex, was that a fact?" The military judge then instructed the members that the question was permissible and they could consider the question and answer "only to test the basis" of the witness's opinion, to "assess the weight" to be given to his testimony, and to rebut the opinion that he gave. The military judge instructed they may not consider the question and answer for any other purpose and they may not infer that Appellant was "a bad person, or had additional criminal tendencies, and that he therefore, committed additional offenses." The military judge asked both sides if they requested additional instructions or objected to his instruction. Civilian defense counsel replied "no, sir."

In his oral and written sentencing instructions the military judge again instructed on this line of cross-examination highlighting "there is no evidence that [Appellant] engaged in this sexual relationship with an unnamed female recruit. This question was permitted only to test the basis of the witness' opinion and to enable you to assess the weight you accord his testimony. You may not consider this question for any other purpose."

---

[18] Mil. R. Evid. 405(a) reads,

> When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the military judge may allow an inquiry into relevant specific instances of the person's conduct.

During sentencing argument, the trial counsel mentioned the defense witness's testimony and then began to argue that "it became really clear, on cross-examination . . . that they don't really know him." Defense counsel objected and the military judge sustained the objection. Before sentencing argument resumed, the military judge instructed the members "to the extent that trial counsel is attempting to get you to consider the validity of the 'do you know or were you aware' question I described to you earlier, again, you are to disregard that question" and "[a]gain, those questions are only used to challenge the basis for that witness' opinion, and for no other purpose." The members had no questions about the military judge's instructions about the sustained objection during trial counsel's sentencing argument.

**2. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

**3. Analysis**

Apart from his convictions, the positive aspects of Appellant's military career were on full display during sentencing. His performance reports, admitted as a prosecution exhibit, depict very strong personnel records in two career fields. The personal data sheet shows Appellant served in two overseas assignments and completed two additional periods of combat service in Iraq. The Defense presented valuable mitigation evidence including positive opinions regarding Appellant's rehabilitative potential.

We have laid out the facts already in this opinion that show how strong the Government's case was supporting Appellant's two convictions. We need not repeat them here. During sentencing argument, the trial counsel recommended that the court members adjudge a bad-conduct discharge, five months of confinement, and a reduction to the grade of E-4 as an appropriate sentence. The court members adjudged no confinement at all, but adjudged both a bad-conduct discharge and reduction to the grade of E-4.

We specifically considered whether the cross-examination of MSgt SK contributed to Appellant's sentence or rendered it somehow inappropriately severe. We find neither. We see no error by the military judge in permitting the questioning under Mil. R. Evid. 405(a). The trial counsel explained his good faith basis for the questioning. The trial counsel's explanation satisfied the military judge and the defense counsel who eventually agreed a good-basis existed for the questioning.

We have nothing before us to suggest that the court members disregarded the repeated instructions by the military judge and increased Appellant's sentence on a matter on which there was no evidence presented. The military judge sustained the Defense's objection during trial counsel's sentencing argument which further reduced any potential impact the questions and answers of the witness could have. Even if this questioning slightly diminished the opinion of this one defense witness, others provided similar character assessments of Appellant without challenge.

Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service including his combat service and various awards and accolades, and all other matters contained in the record of trial, we conclude that the sentence is not inappropriately severe.

## E. SJAR

### 1. Additional Background

On 30 October 2018, the staff judge advocate signed the SJAR to the general court-martial convening authority. When describing the sentence, the SJAR indicated the sentence was appropriate and should be approved as adjudged. The SJAR explicitly advised the convening authority that he did "not have the authority disapprove, commute, or suspend in whole or in part the punitive discharge." The SJAR was silent on whether the convening authority had the power to take the same actions for the reduction to the grade of E-4.

On 20 November 2018, a new staff judge advocate signed the first addendum to the SJAR. This addendum addressed a 30 August 2018 request for deferment of the reduction in grade to E-4 that the convening authority denied on 9 November 2018. This addendum focused on an error in processing the deferment request and recommended the convening authority approve the deferment request beginning 14 days after announcement of sentence. It did not address the convening authority's power to disapprove any part of the sentence and again recommended the adjudged sentence be approved.

On 30 November 2018, Appellant submitted his clemency request. Relevant to this assignment of error, Appellant's defense counsel requested the convening authority "allow him to retain a rank above Senior Airman for the sake of his family's financial conditions." Appellant submitted his own letter to the

convening authority arguing his sentence was "highly disparate to closely re-lated cases" and requested a "conscientious review of the appropriateness of the proposed sentence." In support of his clemency, Appellant included several letters which directly asked the convening authority to let Appellant "keep his rank," "keep his stripes," or not be demoted. Appellant's letter and his defense counsel's letter did not mention the omission that Appellant now alleges was error.

On 6 December 2018, a second addendum was signed by the "Acting Staff Judge Advocate" who was now the third judge advocate to advise the convening authority. The second addendum noted the "earlier recommendation provided in the 20 November 2018 addendum remains unchanged." The second adden-dum was also silent on the convening authority's power to disapprove any part of the sentence.

**2. Law**

Proper completion of post-trial processing is a question of law this court reviews de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citation omitted).

"Failure to timely comment on matters in the SJAR, or matters attached to the recommendation, forfeits any later claim of error in the absence of plain error." *United States v. LeBlanc*, 74 M.J. 650, 660 (A.F. Ct. Crim. App. 2015) (en banc) (citing R.C.M. 1106(f)(6); *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005)). To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) [the error] was plain or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (quoting *Scalo*, 60 M.J. at 436). The threshold for establishing prejudice from errors impacting an appel-lant's request for clemency from the convening authority is low, even in the context of plain error analysis, but there must be "some 'colorable showing of possible prejudice.'" *Id.* (quoting *Scalo*, 60 M.J. at 437).

**3. Analysis**

Appellant relies on our decision in *United States v. Morgan* to support his claim that it was plain error to fail to inform the convening authority of his power to disapprove, commute, or suspend the reduction in grade. No. ACM S32478, 2019 CCA LEXIS 32, at *4 (28 Jan. 2019) (unpub. op.). In *Morgan* we found four errors and a colorable showing of possible prejudice before setting aside the action of the convening authority and remanded for new post-trial processing. *Id.* at *4, 9. One error identified in *Morgan* is that the SJAR failed to inform the convening authority of "his power to affect the adjudged sen-tence." *Id.* at *4. The remaining errors in *Morgan* relate to misstatements in the law regarding the convening authority's power that were made in the de-fense's clemency submissions which the SJA failed to correct in the addendum

to the SJAR. *Id.* at \*4–5; *see also United States v. Addison*, 75 M.J. 405 (C.A.A.F. 2016) (mem); *United States v. Zegarrundo*, 77 M.J. 612, 614 (A.F. Ct. Crim. App. 2018).

The Government argues that Appellant forfeited this claim of error in the SJAR when he failed to comment on it. The Government concedes that the SJAR did not specifically inform the convening authority of his ability to grant clemency regarding Appellant's adjudged reduction in grade. The Government argues the SJAR complies with R.C.M. 1106 and Appellant suffered no prejudice. The Government characterizes a SJAR's description of the convening authority's power as a "best practice" and notes this SJAR contained no misstatements of the law. The Government cites our decision in *United States v. Troester* that a failure to apprise the convening authority that he had the power to disapprove is not the same as advising the convening authority he did not have such power. No. ACM S32385, 2017 CCA LEXIS 332, at \*5 (A.F. Ct. Crim. App. 12 May 2017) (unpub. op.).

We agree with the Government that R.C.M. 1006(d)(3) does not list a statement of the convening authority's power among the "required contents" of an SJAR. One source of such a statement is found in the "sample" or "template" SJAR from Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, Figure A8.9 (8 Dec. 2017). Paragraph 8.16.2.1 of AFI 51-201 provides further guidance that the SJAR "should contain a statement informing the convening authority what is prohibited under Article 60(c), UCMJ, [10 U.S.C. § 860(c),] for offenses committed on or after 24 June 2014."[19]

In this case, the SJAR complied with AFI 51-201, paragraph 8.16.2.1 when it advised the convening authority that he did "not have the authority to disapprove, commute, or suspend in whole or in part the punitive discharge." However, it did not follow the sample or template SJAR when it failed to include language from Figure A8.9, "You do have the authority to disapprove, commute or suspend in whole or in part . . . [the adjudged] (reduction in rank)." We find no plain or obvious error in the SJAR for not following the template when the SJAR otherwise complies with R.C.M. 1106 and caselaw.

We find *Morgan* to be easily distinguished. In *Morgan*, the SJA did not advise the convening authority that he could not disapprove, commute, or suspend the bad-conduct discharge and the seven months of confinement. That failure to advise is not present here as the SJAR correctly advised the convening authority that he could not disapprove, commute, or suspend the punitive

---

[19] This paragraph does not apply to general and special courts-martial referred on or after 1 January 2019 as new post-trial procedures apply to those cases. *See generally* Exec. Order 13,825, 83 Fed. Reg. 9889 (8 Mar. 2018); R.C.M. 1109(d)(2) to the *Manual for Courts-Martial, United States* (2019 ed.).

discharge. *Morgan* also contained a misstatement of the law when the defense counsel argued the convening authority should "shorten" an adjudged confinement sentence of seven months when he had no power to do so. Unlike *Morgan*, Appellant does not identify any misstatements of the law in his clemency submission that warranted correction and we find none. *See Addison*, 75 M.J. at 405; *Zegarrundo*, 77 M.J. at 614. While *Morgan* involved a failure to advise the convening authority that he could disapprove, commute, or suspend the reduction in grade, like we have in this case, it was only a portion of one of four errors listed in the opinion.

Even if the complained of omission was plain or obvious error, Appellant has not made a colorable showing of possible prejudice. The Defense's clemency submission focused on convincing the convening authority that disapproval of some or all of the adjudged reduction in grade to E-4 was appropriate. Appellant claims the convening authority "was not aware" he had the legal authority to grant Appellant's request. We see no evidence in the record of trial to support the conclusion that the convening authority was unaware of his Article 60, UCMJ, 10 U.S.C. § 860, power to grant the requested clemency. Both before and after the 2014 changes to Article 60, UCMJ,[20] convening authorities retained the authority to disapprove an adjudged reduction in grade. The SJAR, first addendum, and second addendum do not state or imply any reduction in the power of the convening authority to reduce Appellant's sentence other than the limitation on the power to disapprove the bad-conduct discharge.

We considered whether the convening authority "plausibly may have taken action more favorable to" Appellant had he or she been provided more complete information. *United States v. Johnson*, 26 M.J. 686, 689 (A.C.M.R. 1988), *aff'd*, 28 M.J. 452 (C.M.A. 1989); *see also United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996). Under these circumstances, we find no plausible reason to conclude that the convening authority would have taken a more favorable action if he had been explicitly advised that he could disapprove, commute, or suspend, in whole or in part, the reduction in grade to E-4.

---

[20] National Defense Authorization Act for Fiscal Year 2014. *See* Pub. L. No. 113–66, § 1702, 127 Stat. 954–958 (2013).

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.[21]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[21] Specification 1 of Charge I, which involved ML, is not accurately reflected on the court-martial promulgating order. Specifically, it contains the word "order" in the second line and the language ", a recruit, as it was his duty to do" in the fourth line. We direct publication of a new court-martial order because Appellant was not convicted of this language and it was neither preferred nor referred to trial.